UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

United States of America,    )   File No. 22-cr-40
                             )            (JRT-LIB)
        Plaintiff,           )
                             )
vs.                          )   Duluth, Minnesota
                             )   May 9, 2024
Steve Anthony Shand,         )   2:58 p.m.
                             )   **DIGITAL RECORDING**
        Defendant.           )
                             )

------------------------------------------------------------

BEFORE THE HONORABLE LEO I. BRISBOIS
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTION HEARING)**

<u>APPEARANCES</u>

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office |
| | LAURA PROVINZINO, AUSA |
| | 600 U.S. Courthouse |
| | 300 South Fourth Street |
| | Minneapolis, Minnesota 55415 |
| For the Defendant: | Federal Public Defender's Office |
| | AARON J. MORRISON, ESQ. |
| | 107 U.S. Courthouse |
| | 300 South Fourth Street |
| | Minneapolis, Minnesota 55415 |
| Transcriber: | ERIN D. DROST, RMR-CRR |
| | Suite 146 |
| | 316 North Robert Street |
| | St. Paul, Minnesota 55101 |

Proceedings recorded by digital recording; transcript produced by computer.

**I N D E X**

PAGE

**CHRISTOPHER OLIVER**
Direct Examination by Ms. Provinzino                7
Cross-Examination by Mr. Morrison                  43
Redirect Examination by Ms. Provinzino             52
Recross Examination by Mr. Morrison                54
Further Redirect Examination by Ms. Provinzino     55

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present)

THE COURT: Please be seated. This is the matter of the United States of America v. Steve Anthony Shand. The Court file is 22-cr-40(2).

Counsel, note your appearances/representation for the record starting with the Government.

MS. PROVINZINO: Good afternoon, Your Honor. Laura Provinzino on behalf of the United States. And I am joined here at counsel table by Border Patrol Agent Christopher Oliver.

THE COURT: All right. Defense.

MR. MORRISON: And, good afternoon, Your Honor. Aaron Morrison appearing on behalf of Mr. Shand who is present in the courtroom.

THE COURT: All right. We have one discovery motion, Document Number 81; and then defense's motion to suppress, Docket Number 83.

Ms. Provinzino, Docket 81 is identical to Docket Number 15, which I granted as part of an order back in October, Document Number 66. That order, I mean, literally identical. And the relief provided in that order was in terms of dates before trial, not dates certain. So the --

that order still seems fully operative.

MS. PROVINZINO: It would, Your Honor, as to Mr. Shand. And I believe Mr. Patel has -- is not contesting this motion as well, so...

THE COURT: So this -- okay. So you're just doing this out of excess of caution, one discovery order to each defendant individually as opposed to one for the case?

MS. PROVINZINO: And you're correct, Your Honor. The original Indictment was only as to Mr. Shand.

THE COURT: Okay.

MS. PROVINZINO: And so the superseding --

THE COURT: Okay.

MS. PROVINZINO: -- brought in Mr. Patel, and so that triggered --

THE COURT: Okay.

MS. PROVINZINO: -- my filing of a subsequent discovery with both, but --

THE COURT: Okay. So -- and because it's identical and that order has already been issued, that's why Mr. Patel chose not to be here today?

MS. PROVINZINO: I assume that's correct.

THE COURT: I mean -- I mean, it's part of it. Because he's not -- he didn't want to be heard on this.

MS. PROVINZINO: No.

THE COURT: I think we got a letter to the --

MS. PROVINZINO:  Nor did he bring any of his own motions.  Right.

THE COURT:  Yeah, yeah.  All right.

MS. PROVINZINO:  So I would assume the same -- the order that the Court has already entered would apply as to Mr. Patel as well.

THE COURT:  All right.  Well, we'll take a look at it.  But, all right.  Thanks.

Mr. Morrison, I don't believe you have any interest in Document Number 81, do you?

MR. MORRISON:  No, Your Honor.  I took it as I filed my discovery motions back and it had already been ordered --

THE COURT:  Yeah.

MR. MORRISON:  -- so I was just filing the supplement --

THE COURT:  Yeah.

MR. MORRISON:  -- based upon receiving discovery.

THE COURT:  Yeah.  Okay.

All right.  Then Document Number 83 is the principal reason we're here today.  It's defendant's motion to suppress.  Relates to Fourth Amendment violations arising out of the stop of a motor vehicle.

Are we ready to proceed?

MS. PROVINZINO:  Yes, Your Honor.

THE COURT:  And --

MS. PROVINZINO:  The United --

THE COURT:  Okay.  Do you have a witness?

MS. PROVINZINO:  Correct, Your Honor.

THE COURT:  Any documents?

MS. PROVINZINO:  No documents.

THE COURT:  Okay.  Mr. Morrison, are you going to have any witnesses?

MR. MORRISON:  Unless we make a decision to have Mr. Shand testify, no.

THE COURT:  Okay.  No -- any documents?

MR. MORRISON:  No, Your Honor.

THE COURT:  All right.  Call your witness.

MS. PROVINZINO:  All right.  Thank you, Your Honor.  The United States calls Border Patrol Agent Christopher Oliver.

THE COURT:  Could you please face the courtroom clerk and raise your --

THE COURTROOM DEPUTY:  Please raise your right hand.

(Witness Sworn.)

THE COURTROOM DEPUTY:  All right.  Please have a seat.  Once seated, please state your full name and spell your last name.

THE WITNESS:  Christopher James Oliver,

O-l-i-v-e-r.

THE COURT:  You may inquire.

MS. PROVINZINO:  Thank you, Your Honor.

**(Christopher Oliver)**

**DIRECT EXAMINATION**

BY MS. PROVINZINO:

Q.  Where do you work?

A.  United States Border Patrol out of the Pembina border patrol station.

Q.  And how long have you worked for the United States border patrol?

A.  Just over 17 years.

Q.  Have you always worked out of the Pembina border patrol station?

A.  No, ma'am.  I started my career in Eagle Pass, Texas, for about three years.

Q.  Okay.  What are your duties as a border patrol agent?

A.  To patrol the border in between the ports of entry to try and detect, deter, and apprehend people from illegally entering the United States.

Q.  Now you mentioned the term "ports of entry."

A.  Yes, ma'am.

Q.  Can you define that for the Court?

A.  A legal entry point in which to enter the United States across the border.

Q.   Okay.   What area does the Pembina border patrol station cover?

A.   It's going to be from the western boundary of Roseau County, Minnesota, all the way over to the Hannah port of entry more or less; about 102 linear miles of border.

Q.   How many agents cover that territory?

A.   I think right now we're somewhere in the realm of about 25 to 30 agents, roughly.

Q.   And within that area, do you have a particular area of responsibility?

A.   We get shifted around as far as our shifts and duties. However, since I've been up there for the last 14 years, I'm scheduled to patrol the Kittson County area more often than not.

Q.   Okay.

A.   About 99 percent of the time, actually.

Q.   What type of training do you have to become a border patrol agent?

A.   So we have an academy in Artesia, New Mexico -- it's about five or six months -- in which we go through immigration and nationality law training, United States Criminal Code, basic constitutional law, and then of course your -- your physical training, firearms training, and so on.

Q.   And then do you have ongoing training after you complete

academy?

A. Yes. We do have virtual trainings that we do and use of force trainings and such that we do throughout the year.

Q. Do you have any collateral duties as a border patrol agent?

A. Yes, ma'am, I'm a small UAS pilot but also a small UAS instructor. I am an EMT, a basic EMT. I'm also our, for lack of a better term, a sensor agent where I deal with all our field technological infrastructure, and then I'm also a resident agent as well.

Q. Okay. And what kind of educational background do you have to become a border patrol agent?

THE COURT: Can -- before you move on, can you, for the record, just clarify what the acronym UAS stands for?

THE WITNESS: It's a small unmanned aerial system.

THE COURT: Okay. Drone?

THE WITNESS: Drone.

THE COURT: You mean a drone?

THE WITNESS: Yes, sir.

BY MS. PROVINZINO:

Q. And then EMT?

A. EMT, basic emergency medical technician, basic certification through the National Registry of Emergency Medical Technicians.

Q.   And what is your educational background?

A.   I have a bachelor of arts in criminal justice with a minor in Spanish.

Q.   You mentioned you also have a role or a responsibility as a resident agent?

A.   Yes, ma'am.

Q.   What is that?

A.   So the resident agent program was developed back around 2010 back when they called it a defense in depth strategy, where agents are assigned these small towns away from the main station.

        One of our main duties as a resident agent is to kind of embed in the community, become part of the community; a lot of liaison where you're talking with locals that live along the border, local stakeholders, whether it be fire, EMS, law enforcement, because the locals are your best force multiplier in that area.  They are the ones that initially, whenever you get to an area, they'll be able to tell you what's out of place and what doesn't belong so you get those phone calls that let you know when they see something suspicious.

Q.   How big is Kittson County?

A.   I'd say maybe around 2,000 people, maybe less.

Q.   Okay.  And are you the primary liaison for that county?

A.   It would be myself, and there's one more resident agent

also that's assigned to that area right now.  I -- excuse me, there has been one.  We just got two more to Kittson County here recently, but it's myself and another that have been there for about 14 years.

Q.   And what is the geographic area of Kittson County?

A.   It would be from the Red River to the Roseau River Wildlife Management Area about; so Karlstad would be the southern most eastern corner.  Pembina would be the northern most western corner.

Q.   Are there any ports of entry or POEs within that area?

A.   Within the Kittson County would be Lancaster, and Pembina would be just over the river into North Dakota.

Q.   Okay.  And how far apart are Lancaster and Pembina?

A.   Probably somewhere between 15 and 20 miles, more or less.

Q.   What type of businesses or industry is in Kittson County?

A.   Kittson County is going to be mostly agricultural, a lot of open fields, a lot of farmers.  You are also going to have -- I think there's some small manufacturing.  Like there's a business in Lancaster called PoDCo where they do powder coating, and I think they build trailers and whatnot.  But, for the most part, the area that I patrolled is either agriculture or what they call bedroom communities where your residents are commuting from these small towns to, say,

Polaris or Arctic Cat, maybe DigiKey down in Thief River, or even Marvin Windows in Warroad.

Q.   Okay.  And what is your sort of typical day-to-day as a border patrol agent like?

A.   I do a lot of driving.  For the most part, I patrol as close to the border as possible on a day-to-day basis looking for footprints, trying to what we call cut sign and detect where illegal entries might have taken place, observe any suspicious traffic that might be in the area of note. To try to do border patrol mission, which is, to detect, deter, and apprehend illegal -- or people that are illegally entering the United States and disrupt transnational criminal organizations.  Also detect and try and apprehend terrorists and terrorist weapons from entering the United States.

Q.   So what type of -- given that you are doing a lot of driving, what type of vehicle do you use?

A.   I patrol in a Chevy Tahoe, four-wheel drive.  It would be more of an off-road style vehicle.

Q.   And is your vehicle marked?

A.   Yes, a big green stripe, border patrol on the side, with the DHS emblem.

Q.   Do you have squad camera?

A.   No.

Q.   Okay.  Do you have body-worn camera when you are on

patrol?

A.   No, ma'am.

Q.   What do you wear when you are on patrol?

A.   It would be a green uniform.  I usually have an embroidered patch on the left chest with a name patch on the right.  Two arm patches, one for DHS and one for the border patrol on either arm.  And then also a duty belt, gun, baton, cuffs, green pants, and usually tan boots lately.

Q.   You talked about driving, yourself, a Chevy Tahoe.  Are there other types of vehicles that you use as part of your border patrol duties?

A.   Our station employs several different -- or a couple of different models of vehicles.  We have Dodge trucks that are four-wheel drive.  We do have what we call (inaudible) units or a -- like a Ford Explorer crossover.  They just assigned those to us, and we're finding they are not very effective in the area we're at because they have a lack of clearance in the winter.  And then we have some larger Dodge 2500 trucks; and then some of our unmarked units, we have our Ford F150s.

Q.   And you mentioned clearance.  Why is that important in your area?

A.   Well, in patrolling the border, sometimes we're required to go into an open field.  You never know if you are going to have to go over a gopher mound or go through the mud.

There are some roads that aren't in the best shape year round.

Also in the winter, we end up with a lot of heavy drifting. You're going through drifts that are sometimes anywhere from a foot to three, four feet high. And we have to be able to be able to make it through those obstacles safely without getting stuck; not only for safety, but we also have to buy shift donuts if we do get stuck and someone has to pull us out.

Q. You talked about Kittson County and the industries. Can you describe the terrain of the area that you cover?

A. So starting from the west, it's a lot of agriculture; very wide open, flat terrain with some tree wind rows. Not a lot of topography at all.

And as you move further to the east, eventually you come across a -- we call it the ridge. It's basically a little bit of a rise in elevation and a treeline. And then you start getting into woods. A lot of oak stands and aspen, birch trees, and whatnot. In those areas, you are going to see more cattle grazing and you do see farming, but that's going to be the terrain for the most part, very flat overall.

Q. What are the roads like?

A. So up near the border, it's a majority of gravel roads. They are maintained. From time to time, graders come

through.  They are very few tar roads that are around or blacktop roads.  It would be your main state roads.  There are a couple of county roads that do have tar on them, but I'd say the vast majority would be your gravel roads.

Q.  And when you are doing your duty and you are driving and looking for footprints, do you typically see many vehicles?

A.  No, not in a lot of the areas that we patrol.  We're, for the most part, patrolling those areas that are as close to the border as possible.  So you're going to see a lot of hunting cabins.  You have some farmsteads that are around.  It will be some residents.  You have some residences that may be a part-time cabin or whatnot, but you don't see a lot of different day-to-day traffic outside of what's going to be going to your ports of entry on your main tar roads.  That will be -- that traffic will vary, but your gravel roads not so much.

Q.  As part of your responsibilities as a border patrol agent, do you investigate human trafficking or human smuggling?

A.  We start a lot of the human smuggling cases, so our cases tend to be very back loaded; so it's -- we initiate the traffic stops when we see something suspicious, start questioning why someone is in a certain area, and start those cases off.  And then they eventually get handed off to HSI or ICE --

Q.   Okay.

A.   -- where it's gone forward to trial most -- more often than not.  But we do the initial.

Q.   That makes sense.  So fair to say you are sort of on the first line of contact?

A.   Yes, ma'am.

Q.   Okay.  Were you noticing anything as far as human smuggling in the time frame of December of 2021 and January of 2022?

A.   Yes.  So as a whole, our area of responsibility historically has been pretty slow.  We don't have a lot of -- a lot of traffic.  In that particular span of time, we started noticing a pattern in an -- the area of 410 and 180th.  And it was the first time in my 14 years up there -- or I guess at the time it would have been about 12 years -- that we overtly saw what we thought was an organization using that area on a regular basis.

Q.   So describe -- you mentioned the area of 410 and 180. Can you describe that area?

A.   So at 410 and 180th -- 410 runs east/west, 180th runs north/south -- there's what we refer to as a gas plant, which is the Viking pipeline pump station.  There's also another matching gas plant on the Canadian side of the border, which I believe belongs to ONEOK is the company.

          That four-way intersection in that particular time

of the year, more often than not, is impassable.  If you go to the west, it turns into what we refer to as a gumbo road, clay, it's not even gravel, and it is allowed to plug in very early in the snow season, so very high drifts, no one drives it.

Going north is one of the only semi-maintained roads that goes directly to the border in that area.  For the most part, all your other properties, 410 is the closest the public is going to be able to go without going onto private property.  But here there is a two-track that will go all the way up to the ditch that is the line, and then it turns to the east where there's a ONEOK station that's right there just on the U.S. side of the border.  That is allowed to plug in because no one goes up there for anything during the winter.  It's drifted in all winter more often than not.

And then to the east, there is one resident that's out there.  He's there part-time.  We're usually pretty familiar -- or at least I'm pretty familiar with him, along with the sheriff's department, because he has some mental health issues.  I believe he spends most of his winter in California.

And then there's -- a little further to the east there, there's what we call a grain leg, where there's going to be a lot of grain bins, an old farm site that's right there that's going to be farm traffic that comes and goes.

Q.  So fair to say you're fairly familiar with that area?

A.  Yes, ma'am.

Q.  Now this gas plant -- the Viking gas plant you're talking about, how far is that from the U.S./Canada border?

A.  It's roughly a half mile, more or less.

Q.  Now you said you were observing, over that month-long period, what appeared to be an organized human smuggling route.  Describe what you mean by that.

A.  So it -- there was a distinguished pattern midweek where we'd cut fresh -- or we'd find fresh footprints leading away from the Canadian border to that exact intersection.  I believe the first call-in report of it was on the 22nd of December.  And then our agents logged sign being cut there again on the 29th.

Then after that, I believe the -- the next event was on the 12th, and then there was the apprehension that was on the 19th.  So three out of four Wednesdays leading up to the arrest there was fresh sign cut.

Q.  Okay.  And describe what was significant about -- when you say "sign cut," does that mean footprints?

A.  Footprints, yes, ma'am.

Q.  Okay.  What was significant about observing that pattern?

A.  So whenever you see that pattern repeat itself, it's indicative that somebody has identified that area for

smuggling, but also the boots that we were seeing were very similar. Even after the arrest was made, we did find that some of the boots that one of the subjects that was arrested was wearing matched exactly the sign from a previous event that was logged; so that we had an idea that they were connected as far as events go from that -- once we had everybody arrested in that particular event.

Q. Had border patrol recovered any items of significance along that pathway?

A. Yes. I can't remember which event it was, but along the lines, our intel unit put out information that they had recovered a backpack that had a price tag on it that was in Indian denomination. I believe rupees.

Q. Now you talked about the Viking gas plant right at that intersection of 410 and 180. Can you describe that facility?

A. It's very industrial in appearance, a lot -- big metal buildings. Pipe works that you'd expect from like the oil industry or like an oil refinery sort of setting; some big smoke stacks, chain link fence, barbed wire that goes all the way around it with a very defined interest in the northwest corner of the plant on 180th.

Q. Is that one of the few big landmarks in the area?

A. It's the only big landmark in that area with the exception of another matching gas plant that's on the

Canadian side.  Otherwise, there's not much for very large buildings in that area.

Q.  And what have you observed in terms of workers at that facility?

A.  Normal traffic from that facility.  They get a lot of subcontractors that come through that do maintenance.  We don't see them in the winter as much, but there are still offices, day-to-day traffic that go through there.  But whenever your subcontractors come through, they tend to be workers.  What you'd expect to be reminiscent of oil traffic; big work trucks with maybe diesel tanks or tool boxes in the back.  The workers usually have a uniform on from what I've seen, like a -- almost like an auto mechanic style uniform or whatever.

Q.  Is that landmark visible outside of the area?

A.  From the north, it's one of the only landmarks that we think -- or that we consider that illegal traffic crossing would key in off of as a guide, because at night, it is -- it is lit so you can see it on the horizon.

Q.  Okay.  So based on kind of that pattern of activity and its closeness to the border, I guess, first let's -- do you recall being on duty on January 18th, January 19th of 2022?

A.  Yes.

Q.  First can you describe to the Court sort of the weather patterns during that time frame?

A.  So the 18th, there was a big windstorm, snowstorm that came through.  Temperatures dropped.  It was near zero visibility.  We hadn't been able to patrol that day because if you go out and patrol in that sort of weather and get stuck or in a ditch, you become a liability to your coworkers, so it's best not to go out unless you have a purpose or a reason to go.  So most of our agents stuck close to their offices that day, if they went out at all.

Then the morning of the 19th, I believe I waited until probably close to 7:00, until daybreak, the sun came up, because even though the warnings subside, large wind gusts come through and can make things quite treacherous with zero visibility even though there's not a blizzard warning.

So came on, left my office sometime around 7:00.  And driving, the state highways were decent.  They looked like they had been cleared.  A lot of the tar roadways had been cleared, but there wasn't a lot of traffic.  People were still digging out from the storm.

But your side roads were extremely treacherous, a lot of very large drifts were in the -- or were on those side roads making it very difficult to travel.

Q.  And by that, had they not been plowed yet?

A.  They had not been plowed yet.  None of the ones that I had seen had been plowed yet.

Q.   And so what was your plan when you got to your duty station that morning on Wednesday, January 19th?

A.   Well, so I don't necessarily go to the duty station, so that's part of the resident agent program is that I'm already in my area.  So as I came on duty, my supervisor called me, and we both agreed it would have been stupid for people to cross.  However, someone needed to get up to the gas plant and look for footprints.  We had -- we knew there was a very good chance that we would find fresh sign, even though it would have been a bad night to cross.

So he told me that if I wasn't going to go up there, he would.  And I told him, nah, I was going to go straight up that way.  So I left from my office and went directly to the gas plant area, the 410 and 180th.

Q.   And describe your drive to that location.

A.   So after a storm like that, it's kind of eerie because you don't see a lot of traffic out and about.  Most of your normal traffic -- traffic in that area is slow in the winter anyway, but it's more so after a large storm.

As I got up towards Humboldt and went to go turn off the main highway, 75, there was a very large drift that was on County Road 6 about 10 to 15 yards wide, two to three yards deep.  It was one of those things where you had to really stop and look at it for a second and then really give it the gas to make sure we didn't get stuck.

Q.   And just to clarify, I think you said two to three yards deep.  Did you mean yards or feet?

A.   I'm sorry, feet.  Two to three feet deep.

Q.   Okay.

A.   So we made it through the drift -- or I made it through the drift and then turned north on -- it's either County Road 16 or County Road 55.  It's kind of an area where a lot of your gravel roads have multiple nomenclature.  It's 180th for the most part.

Q.   Okay.

A.   It's the water tower in Humboldt.  And turning north there, there was a lot of drifts that were in the way going up.  It was a more treacherous drive than what it usually would have been to get up to that area.

Q.   How was the visibility?

A.   Visibility wasn't too bad at that point.  You could see pretty well that morning.  It had crisped up quite a bit. You know, the morning after a storm, it's extremely cold, bitter, bitter wind, but it was clear at that point.  I know later on in the day some of the agents had issues with visibility, but at that point, it was pretty clear.

Q.   And you talk about bitter cold.  Do you recall the temperatures?

A.   Not exactly.  I want to say with the windchill, it was somewhere in the realm of negative 30 to negative 20 below

zero.

Q. And as a border patrol agent, what would you typically wear in those kind of weather conditions?

A. So we do have extreme cold weather gear; snow pants, very heavy jackets, baklavas. We have, like, fleece caps; very, very thick gloves; big, heavy winter boots. But kind of a -- with our agency, a lot of that stuff is given out as secondary equipment, so it was in the back of my truck. So at the point of my traffic stop, I didn't have any of that stuff on, which was unfortunate because it was an extremely cold day.

Q. How long did it take you from your duty station to arrive at that intersection of 180 and 410?

A. Probably an hour and twenty minutes to an hour and a half more or less. And usually that would be somewhere a little less of an hour drive, more often than not. And that day it was extended a little bit because of the -- or quite a bit because of the weather.

Q. Did you observe other vehicles while you were driving to that intersection?

A. No.

Q. So when you got to the intersection, what did you observe?

A. Well, as I approached the intersection from the south, I observed a vehicle turning to go north towards the gas

plant.  It was a white vehicle.  At that point I couldn't tell whether it was an SUV or not.  And initially I thought it was another agent that was going to look for footprints, someone that was going to beat me out there to look for sign.

As I approached, I realized it wasn't one of our agents.  High center of gravity on the vehicle, the higher roof line on it didn't match what our Tahoes usually are or any of our other trucks.  And as I got closer, I noticed it was a large white panel van going north.

I observed it do a three-point turn at the intersection of 180th and 410, and then proceed back south.  That it was moving at a slower rate than what you'd usually see on traffic.  And I noticed that it was occupied by three occupants that I could see, and had an out of state license plate on it.

Q.  So you identified it doing a three-point turn.  What was significant about that in your observation?

A.  So it was less the three-point and more just the turn.  As he came up to the intersection and did his turnaround, it signified to me that he didn't have any business going east to the residence that was there or any of the farm infrastructure that was there.  And he had to pass the main entrance of the gas plant twice, once going north and once coming south, which signified that he probably didn't have

any business at the gas plant either.

And on top of being at the exact intersection where we had had a pattern of traffic, almost within -- traffic might have been within ten yards of that intersection but always came to that intersection, made that turnaround pretty significant at that exact spot.

Q.   And as you got closer, you said you observed three occupants in the vehicle?

A.   Yes, ma'am.  There were two in front, the driver and passenger in front, and then it appeared a third occupant in the back.

Q.   And what was significant about that?

A.   With the third occupant in back, to me, in my experience, it means it's probably not a utility van of any sort.  So no markings meant it wasn't -- or, a local business that I knew of, whether it be a plumbing or heating or electrician, per se.  But in a utility van that would have been that size, you would expect to see racks for tools or anything like that.  With someone being in that backseat, it told me it was probably a passenger style vehicle on the inside.

Q.   And how would you describe the size or the seating capacity of that vehicle?

A.   Significant.  There was probably at least ten passenger seats once we got into the vehicle and looked at how big it

was on the inside.  But by border patrol standards, you could fit a very large number of people in there if you are not worried about legal seating.

Q.  Okay.

A.  And my concern as an agent was that I could see three people, but how many people were concealing themselves possibly on the inside if it had, in fact, loaded up.

Q.  Okay.  Now you mentioned there weren't any markings on the vehicle?

A.  Not that I could observe, no, ma'am.

Q.  And was that significant to you?

A.  Just that it was not a local business that I knew of or any of the local electricians that I knew of.  You know, most of the guys that work in that area have their business logos on their van if they are going to be going, so it told me that it wasn't from the area, on top of the Missouri license plate.

Q.  So what was -- you said it was the out of state Missouri license plate?

A.  Yes, ma'am.

Q.  Okay.  Did you take any steps to learn more about the vehicle based on the license plate?

A.  So I did call in the vehicle to dispatch to have the license plate run to see where it came back to.  I don't believe I got the return on it prior to initiating the

traffic stop, but it did eventually come back that it was from a rental company.

Q.  Is that significant, the fact that the vehicle is from a rental company?

A.  Yes, ma'am.  We find that smugglers like to use rental vehicles for two reasons.  One is face value anonymity.  So whenever you run a license plate, you can't see -- get a name and date of birth of the registered only -- excuse me -- owner, but more so is it circumvents asset forfeiture, so if they do get caught smuggling, when we seize the vehicle, they are not out any personal property or value.

Q.  Now based on your extensive, you know, experience driving kind of on a day-to-day basis, do you typically see rental vehicles of that type up in your area of responsibility?

A.  No, ma'am.  I've never seen a rental passenger van in that area in my 14 years.

Q.  What about vehicles from Missouri?

A.  It's possible, but your out of state plates in that area would be more North Dakota, Minnesota -- or I'm sorry -- the plates you'd see would be North Dakota, Minnesota.  We get some from out of state, but it would be more during farm traffic season where you are going to have workers that come up to work the different farms.  Maybe during hunting season where you have a bear season or a deer season going on,

we'll see out of state plates. But those are going to be more in your wildlife management areas, public hunting grounds, and then near your farming areas where your workers are going.

That area up there there's no reason for an out of state plated vehicle to be in that area unless it's going to be gas plant related at that time of year. And we don't see very much for subcontractors that time of year.

Q. So is that significant for you to see a rental vehicle with an out of state plate?

A. Yes, ma'am. It tells me that there's -- it's more likely that -- or probable that they don't have a reason to be in that area.

Q. So based on all that information, what did you decide to do?

A. We initiated a traffic -- or I initiated the traffic stop by turning on my emergency lights. The vehicle was slow -- or was slow rolling in front of me. I think I did a hard count of six before I actually activated the siren. Not a long wail, just a quick whoop, and it -- the vehicle came to a stop.

I got out, approached the vehicle. My normal introduction is usually, you know, Good morning. Agent Oliver, United States Border Patrol. Where are you coming from today? To that, the driver, identified as Mr. Shand,

already had his license -- driver's license out and some other documentation I really didn't pay attention to -- it might have been a rental agreement or insurance paperwork. I can't remember -- to hand to me.  I noticed the driver's license was out of Florida.

And the answer he gave me was kind of a nonanswer. It was that he had been stuck in a ditch for five to six hours, had just been pulled out, and had gotten lost on his way to Winnipeg to see friends.

Q.  Okay.  And he -- that was a nonresponsive answer to what?  What question did you ask him?

A.  So -- I'm sorry, the answer to the first question was that he had been stuck in the ditch and had been pulled out.

Q.  Okay.

A.  My follow-up question is:  Where are you going to?  And that's when he told me he had gotten lost on his way to Winnipeg to go see friends.

Q.  Okay.  And based on your experience in that area, is that a plausible explanation for where he was found, that he was on his way to Winnipeg?

A.  No, ma'am.  All of our legal ports of entry that are in that area are going to be on main -- main roads, tar roads. Pembina port of entry is on I-29, the largest trunk highway in the area.  Lancaster port of entry is on Highway 59, the largest trunk highway outside of Highway 75 on the east

side.

Highway 75 leads up to an old port of entry in Noyes, Minnesota, which has been shut down. I have had turnaround traffic there that happens a lot where people miss the turn to go into Pembina, or even Google will lead them up Highway 75 to that point to go into Canada. But the area of 410 and 180th is so far away from a legal crossing that if your destination was Winnipeg, it wouldn't show up on any sort of mapping service.

Also kind of of note in that area, the Minnesota side is not a perfect grid pattern like most of North Dakota is. So in order to even get between ports of entry, there's a lot of turning and going north and south and east and west, zigzagging your way across, if you are taking gravel roads, to get between the two, which would have been quite a treacherous drive on that particular day.

Q. Okay. So not a -- you'd be unlikely to see any vehicle legally going into Winnipeg in that area; is that fair to say?

A. That is correct.

Q. So Mr. Shand hands you this Florida driver's license?

A. Yes, ma'am.

Q. What did that -- what was significant about that?

A. Once again, it's from out of the area. So it's somebody that -- although it points to the fact that he's not

familiar with the area, it's someone -- a lot of our smuggling traffic we see is not going to be locals that are in that area.  So the fact that he's from out of town tells me that he needs a reason or should have a reason to be in that very remote area of Kittson County, to which being from Florida says that traveling to Winnipeg, that's just not plausible that he should be there.

Q.  So what did you do with that information?

A.  Went back to my vehicle.  As I said, my winter gear was in my backseat so I didn't have a chance to don it for the day and it was very cold.  So went back to my vehicle to kind of thaw out and call his information in and make sure that other agents were responding to where I was at.

During -- while talking to Mr. Shand, I had also seen two other occupants who were in the vehicle, one in the passenger's seat and one in the backseat, that appeared to be of Indian descent.

Q.  Okay.  And what did you observe Mr. Shand to be wearing?

A.  So Mr. Shand, if I remember correctly, was wearing, like, sweats.  He didn't have a lot of really heavy garb on. It wasn't stuff that would -- that you'd be wearing for the weather, per se.  Something that if you were in a vehicle driving, you'd be wearing for the day.

Q.  Did he have anything with a business insignia or logo representing an organization or business he worked for?

A.  Not that I observed, ma'am, no.

Q.  You said there were these two other passengers that appeared to be Indian?

A.  Yes, ma'am.

Q.  So what did you do based on that information?

A.  After going back to my vehicle and calling in Mr. Shand's information, I approached the van on the passenger's side of the vehicle.  At the passenger door, they rolled down the window, and I asked the passenger where he had been coming from today.  And I emphasized the "from." And he was very soft spoken, somewhat meek in his response, in which he said he was coming -- he said, Winnipeg.  And I asked him again, You're coming from Winnipeg?  To which he said, Yes.

At that point, I asked for his identification, and he produced an Indian passport.  A quick glance at the passport, there were no visa stickers or stamps that I could see initially in the passport.  I then opened the door and asked him to step out of the vehicle, which I noticed he had -- his boots were not on.  He had the thicker coat and the backpack.  I can't remember if the backpack was in front or it might have been in the backseat.  It might have been his coat that was around.  But he had removed his boots to apparently warm his feet quicker as if he'd been out in the weather.

I then opened the rear passenger -- I think -- I can't remember if it was two doors, like a French door or a sliding door, it might have been the two doors -- and asked the rear passenger for his identification.  There was an obvious language barrier there.  I had to kind of motion, you know, hold up the passport, you know, identification.  He had to dig around and find it.  He too also had his boots off as if he was trying to warm his feet a little quicker.

Once they had their boots on, it's kind of our standard operating to separate people that might be smuggled from the people that are smuggling them to prevent any sort of story or corroboration or anything like that.

I believe Mr. Shand asked me at that point what I had stopped him for, and I told him that he was being detained for suspicion of alien smuggling and did a quick pat down of the two individuals and brought them back to my vehicle.  I think I also asked Mr. Shand to go ahead and turn off the vehicle and give me the keys.

Q.  Okay.  Now the passenger in the rear seat, what portion of the vehicle was he in?

A.  He was in a bench seat that was just behind, I believe, the driver and passenger.  And I believe there's at least one bench seat, maybe two, that were behind him.

Q.  And did he -- I know there was a language barrier, but did he, in fact, produce any identification for you?

A.   He did give me an Indian passport that also appeared to have no sort of markings or visa stamps or stickers on the inside.

Q.   Okay.  And did you observe -- what kind of items did you observe inside the vehicle?

A.   Backpacks of the two individuals, their coats.  Also -- I'll go back, I also did ask Mr. Shand to be truthful with me and tell me how he knew the two individuals.  And he told me that they had approached his vehicle while he was stuck in the ditch and were knocking on his windows, and that he could not leave them out in the snow.  So --

Q.   Did that seem to be a plausible explanation for how he had encountered them?

          MR. MORRISON:  Objection.  Speculation.

          THE WITNESS:  Um --

          THE COURT:  Well, just hang on.

          THE WITNESS:  Yes.

          THE COURT:  Overruled.  You can inquire on cross as to the foundation for his opinion.

A.   So that remote an area with the zero visibility weather the night before, Mr. Shand told me he had been in that ditch for five to six hours.  That would have put him in the ditch at night in the dark.  He -- I observed him approaching the gas plant from further south, I believe on 409 -- I think it was either 408 or 409 that turns north to

the gas plant.  So two individuals walking on a wet -- a night that had that bad weather in the dark, finding his vehicle in the ditch would have been very, very difficult, especially with how remote that area is.

Q.  Did you identify any other vehicles that those two men may have been driving in?

A.  No.  There were no other vehicles that I could see driving up to the gas plant area in the ditch or otherwise that they would have been connected to.

Q.  And what kind of belongings did they have with them?

A.  I am not quite sure.  I didn't get a chance to search their backpacks very thoroughly.  My main concern was to get them in my vehicle and out of the cold, so got them into the vehicle after doing a quick patdown, and I believe I threw their backpacks into the rear hatch of my vehicle, which is separated from the cage in the back.

Q.  Is there anything significant about having backpacks?

A.  Easy travel.  So a lot of our people that cross the border on foot illegally will have some sort of backpack or some sort of easy bag to carry with them when they make that walk because it's more mobile.

Q.  Did any of your colleagues then arrive on scene to assist you?

A.  Yes.  Shortly after calling in the information for those two individuals, their passport numbers and so on, a

supervisor showed up and got out of the vehicle.  And I went and talked to him and let him know what I had found out so far, and he opened the vehicle, and we asked Mr. Shand to step out, and he was placed under arrest for alien smuggling at that point.

Q.  How did he respond when he learned of that?

A.  He didn't object.  It was more of a moan and a groan, like an ah, man, but there wasn't a lot of objection from him.  He didn't have a lot to say.

Q.  What did you observe in terms of any personal belongings that Mr. Shand had?

A.  So when we had him get out of the vehicle, I believe he had his wallet.  He had, I believe, two cell phones that were on his person.  Those were placed in the driver's seat of the van.  And then I believe he was allowed to keep his wallet.  I can't remember if he was allowed to keep it or if it was put in the driver's seat as well, and then he was secured in the other agent's vehicle.

Q.  You talked about two cell phones.  Did you search those phones at the time?

A.  No.

Q.  Did you observe Mr. Shand using those phones?

A.  Yes.  While I was getting the individuals out of the van, I can't remember if he was texting or making a call. He stated that he was calling -- or trying to get ahold of

his wife I think is what he had told me.

Q.   And he -- did he relinquish the keys?

A.   Yes, yes, he did.

Q.   And at some point was there -- did you later search the vehicle?

A.   No.  There were more agents that showed up on scene as we were getting ready to leave.  The next agent on the scene, handed the keys over to him so they could go ahead and do the inventory search of the vehicle and see if there was any other evidence of more crossing or more contraband that might be in the vehicle.

Q.   What was found in the vehicle?

A.   From what I understand, there was maybe some snacks and drinks that were in the back.  But other than that, maybe some documentation from the rental company.  I think some documentation of a prior rental.  But other than that, that's all I heard about afterwards.

Q.   Do the snacks and drinks have any significance to you?

A.   It seems if someone is going to be picking up a large number of individuals near the border, that -- and then making a drive afterwards, that it might behoove them to have snacks and drinks so you can make less stops, so it's more obvious as you're making your journey.

Q.   And do you know if those cell phones were later subject to a search?

A.   I know that they were searched later on.  It would be protocol for our guys in intel to ask for permission and get a release form signed.  If that is not done, then there -- a warrant is applied for and they are sent off to a lab I believe.

Q.   Okay.  Do you know if that happened in this case?

A.   I believe it was done.

Q.   By warrant?

A.   By warrant, yes, ma'am.

Q.   Where did you -- after arresting Mr. Shand, where did you bring him?

A.   So after the arrest was made, myself and the other agent began traveling back to the station.  We actually took the long way around because the agent took the shortest route from the station and said the roads were way too treacherous to go back the same way.

So we traveled directly south on I believe it's still 180th, that road jogs around, but south to the Humboldt water tower.  As we got to that area near the water tower, agents radioed in that there were more individuals coming out of the field.  And one of the agents that was on the scene is our -- one of our other EMTs.  He went ahead and called for an ambulance to come en route because they were more than likely going to have hypothermia.

Q.   And did you, in fact, assist in your EMT capacity later

that day?

A.   Yes.  So at that point myself and the other agent turned around just in the event that they needed more warm space for bodies.  Some of our vehicles don't have a lot of storage space.  Five bodies are coming out, but you don't know how many more might be out there.  So we turned around.

I think at that point we also asked the aliens in my vehicle if there was anybody else in the field.  They told us no.  We then asked Mr. Shand the same thing, Is there anybody else in that field because they will die if you don't tell us?  And he said, No.

And we came back up.  I got out of my vehicle as we got to where the agents were with the other individuals, and asked where the most serious ones were in the opinions of the agents.  I opened the first vehicle and there was a female in the backseat that kind of slumped over, fell to the side whenever I opened up the vehicle.

At that point, I did a sternum rub on her to try and gauge a level of responsiveness.  Sometimes we do get people that will fake injuries on occasion to be brought to the hospital.  They think maybe we're not going to arrest them if they have to go to the hospital.  So I did a relative -- a sternum rub to see if there was any pain response, to which she barely responded.  As I pressed harder, she should have been moving away.  There was very

little response.  I also noted that her breathing was very shallow.

It was at that point that I told the agents to remove the other subject from inside the vehicle, because he seemed just as surprised about the way she was acting or worried about the way she was acting, so I figured he was still okay.  They removed him, and I jumped in the backseat and told the other EMT to start driving south so we could meet the ambulance.

Q.  So you then were helping on the medical side of things for the day?

A.  Yes, ma'am.

Q.  Is that right?

Do you know, Mr. Shand then, was he taken to the Pembina border patrol station?

A.  Yes, he would have been eventually transported to the Pembina border patrol station --

Q.  Okay.

A.  -- and placed in a separate cell from all of the other individuals that we had in custody.

Q.  And did he make any further comment?

A.  Not that I'm aware of.

Q.  Do you enforce Minnesota traffic laws?

A.  No, ma'am.

Q.  And explain that.

A.   We're trained in federal law, basic United States Code, and immigration and nationality law.  Our job is to catch people that are illegally crossing the border, whether it be smuggling people, smuggling goods, contraband such as narcotics.  I even was part of a case in Eagle Pass where they had tennis shoes that they were trying to smuggle across because they were trying to avoid paying duty on taxes on the shoes.

And then also we are to try and disrupt transnational criminal organizations.  Those are our main goals, so traffic law does not really fall into my purview.

Q.   And during your interactions with Mr. Shand, did you ever pull a gun?

A.   No.

Q.   And I know you mentioned you don't wear a body-worn camera; is that right?

A.   That is correct.

Q.   Did you do anything to document your encounter with Mr. Shand and the two Indian nationals that day?

A.   After we got back from the hospital that day -- I was on hospital watch most of the day, but after we got back, sat down in front of the computer and started typing out the event as -- from my perspective, my supplemental report.

Q.   And then after that did you have further involvement with the case?

A.   No, ma'am.

MS. PROVINZINO:   Thank you.   No further questions.

THE COURT:   Cross?

**CROSS-EXAMINATION**

BY MR. MORRISON:

Q.   Agent Oliver, Pembina and essentially 70 -- Highway 75 that you were referencing -- I'm going to start over.

Highway 75 comes up kind of southwest through that corner of Minnesota; correct?

A.   It comes from the south.   Kind of parallels the Red River, yes, sir.

Q.   Okay.   And if you follow Highway 75 all the way up, it will bring you into Pembina?

A.   No, sir.

Q.   It will get you to St. Vincent junction where you can take the highway over to Pembina?

A.   Yes, sir.

Q.   Okay.   And I-94 also kind of follows the Red River up north?

A.   No, sir.

Q.   Okay.   I-94 runs through Pembina?

A.   No, sir.

Q.   Or, I'm sorry, I-29.

A.   That is correct, sir.   Yes.

Q.   Okay.   And I-29 parallels the Red River?

A.  Yes, sir.

Q.  Okay.  And, essentially, the -- we're about three, maybe four miles from Highway 75 at this gas plant?

A.  Yeah, four to five miles from 75, yes, sir.

Q.  Okay.  So, you know, if you are heading -- if Google Maps is taking you up to cross on I-29, which you said is a common crossing point; correct?

A.  Yes, sir.

Q.  And it takes you up I-70 -- or up Highway 75 and somebody gets lost three, four miles off of there, you know, it happens; right?  People get lost?

A.  Up 75, yes, sir.

Q.  Okay.  And let's talk about -- you know, I -- I appreciate you're a local up in that area; correct?

A.  For 14 years, yes, sir.

Q.  Yeah, you know the people that are coming and going?

A.  Yes, sir.

Q.  Correct?

        Nothing illegal about being from Missouri and being up in this area of Minnesota, is there?

A.  No, sir.

Q.  Absolute right of any citizen in this country to travel anywhere they want; correct?

A.  Yes, sir.

Q.  For any reason; correct?

A.   Yes, sir.

Q.   Any time of the year; correct?

A.   Yes, sir.

Q.   And just because you don't recognize that person, doesn't mean they are not -- they are doing something illegal, does it?

A.   No, sir, it doesn't.

Q.   Okay.  And just because somebody has a Florida driver's license in northwestern Minnesota, doesn't mean they are doing anything illegal, does it?

A.   No, sir.

Q.   Okay.  And same, a rental vehicle, doesn't mean you're doing anything illegal; correct?

A.   No, sir.

Q.   There's a lot of reasons to be up in northwestern Minnesota; correct?  It's a beautiful part of the state.

A.   I don't know if I'd say a lot of reasons, but there are reasons to be up there.

Q.   Hunting?

A.   Yes, sir.

Q.   Walhalla is not too far away in North Dakota?

A.   Over an hour to the west, yes, sir.

Q.   Yeah, it's a beautiful little town over there in the hills?

A.   Yes, sir.

Q.   Okay.  There's I-29 crossing into Canada just four or five miles away?

A.   Yes, sir.

Q.   And, you know, when you initiated this traffic stop, you had no idea if this was a rental vehicle or not; correct?

A.   No, sir, I didn't.

Q.   You talked about the passengers were, in your observation, people of Indian descent; correct?

A.   Yes, sir.

Q.   Okay.  And you also noticed that Mr. Shand was an African-American?

A.   I will say that maybe, but it wasn't part of what I'd use as my articulable facts for the stop.

Q.   Yeah, because that would be impermissible, wouldn't it?

A.   Probably, yes, sir.

Q.   Okay.  And you're telling the Court all of Missouri plates, no markings on the van, those were all important to you, but you ignored the fact that Mr. Shand was a black man in your neck of the woods?

A.   I was more concerned with pulling the license plate than -- and getting a head count than I was getting descriptions of the people that were inside.

Q.   You didn't wait in your car long enough to get the read back on the license plate before you went up and initiated the stop, did you?

A.   No, sir, I didn't.

Q.   Okay.  And you didn't see this van crossing the border?

A.   No, sir.

Q.   You didn't have a single report of a van crossing the border that day?

A.   No, sir.

Q.   Instead, you saw a van that you didn't recognize doing nothing illegal, as far as you saw, driving down the road; correct?

A.   I saw a van that I did not recognize with an out of state plate driving on poor road conditions after a significant storm go to a dead end near the border and turn around.

Q.   Did you see him doing anything illegal?

A.   No, sir.

Q.   And you talked he was driving slow.  You just talked about the poor road conditions; correct?

A.   Yes, sir.

Q.   That's a prudent thing to do, to drive slow in poor road conditions; correct?

A.   Yes, sir.  Absolutely.

Q.   And then you also talked about after you stopped him, you complained he was in some sweat pants and that didn't make sense to you.  It wasn't proper clothing for the temperatures; correct?

Olivier - Cross 48

A. If he was going to be outside, it wouldn't have been. So he wouldn't have been a worker or someone that would have been doing outside work at the gas plant or agricultural worker.

Q. Okay. Well, you know, you're a border patrol agent and you've been telling us about how your winter gear was packed away and you weren't dressed appropriately either.

A. That is correct, sir.

Q. Were you doing something illegal that day?

A. No, sir.

MS. PROVINZINO: Objection.

THE COURT: That's --

MR. MORRISON: I'll withdraw.

THE COURT: Yeah.

BY MR. MORRISON:

Q. This event occurred January 19th, 2022, this traffic stop; correct?

A. Yes, sir.

Q. And you essentially, in talking about the initiation of the stop and the beginning search of the vehicle, essentially the talking to Mr. Shand, that's represented in two narrative paragraphs of your report; correct?

A. I can't recall.

Q. If you looked at your report, would that refresh your recollection?

ERIN D. DROST, RMR-CRR
(651) 848-1227

A.   Absolutely.

         MR. MORRISON:  May I approach, Your Honor?

         THE COURT:  You may.

A.   Yes, sir.

Q.   Does that refresh your recollection that the stop of the vehicle and the initial conversation with Mr. Shand is represented in two paragraphs of your report?

A.   Yes, sir.

Q.   Okay.  We have no recordings of this incident; correct?

A.   That is correct.

Q.   And you testified about what you normally do when you approach a vehicle.  You recall that?

A.   Yes, sir.

Q.   Do you have a -- as you sit here today, can you honestly tell this Court you have a clear recollection of the conversation and how you started that conversation out with Mr. Shand that day?

A.   Yes, sir, the way I start every traffic stop.

Q.   Okay.  Every traffic stop?

A.   Yes, sir.

Q.   Okay.  And you recall then that you also told Mr. Shand to immediately put the vehicle in park?

A.   I might have if he was -- wasn't in park already.

Q.   Okay.  And you recall you had him turn the vehicle off and hand you the keys immediately?

A.   I don't believe I asked for the keys until after I asked the individuals to step out of the vehicle.

Q.   Okay.  And --

A.   Excuse me.  I did initially ask him to give me the keys; however, I thought because of the weather conditions, it was prudent to allow him to leave the vehicle running, so I withdrew and told him never mind, hold on a second, if I remember correctly, and that's when I went back and ran his information.

Q.   Okay.

A.   I didn't -- I don't believe I asked for the keys again until I came back and after I had spoken with the other two individuals.

Q.   But of course you made no reference to any of that in your two paragraphs of your report?

A.   No, sir.

Q.   And to be clear, nobody gave you any form of consent to search this vehicle; correct?

A.   No, sir.

Q.   Nobody consented or opened their -- the doors of this vehicle for you; correct?

A.   No, sir.

Q.   You opened the doors; correct?

A.   That is correct, sir.

Q.   And when you did get the read back on this plate, there

were no warrants; correct?

A.  No, sir.

Q.  Did you ever run Mr. Shand's Florida driver's license before pulling him out of the vehicle?

A.  I believe I called it in to see what we call like a blue light special for checks, which would have been immigration, would be criminal, and any crossing history.

Q.  Anything come back that created any suspicion or issues?

A.  Not that I can recall, no, sir.

Q.  Nevertheless, you began demanding identification from all those individuals in the vehicle?

A.  Yes, sir.

Q.  And you have no authority to enforce any traffic laws, as you testified?

A.  No, sir, I don't.

Q.  Okay.  And, nevertheless, you also demanded that Mr. Shand provide you with his identification?

A.  Yes, sir.

Q.  And prior -- this is -- I'll finish here.  Prior to stopping Mr. Shand, you had zero evidence that that vehicle had ever crossed the border?

A.  That is correct, sir.

Q.  Thank you.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MS. PROVINZINO:

Q.   You were asked some initial questions about roads in that area, including, I believe, Highway 75.  Do you recall that?

A.   Yes, ma'am.

Q.   In your training and experience, would you expect to see people lost in that area?

A.   On Highway 75, it happens quite frequently where they miss the turn-off to go to Pembina.

Q.   Okay.  And would that be a plausible explanation for where you located Mr. Shand that day in location to Highway 75?

A.   No, ma'am.  There -- depending on where he got off of -- or approached the gas plant -- from the -- the area that I saw him driving from would have been from the west, north towards the gas plant, which would have meant that he had probably pulled off closer to either south of the turn-off to go to Pembina or there's one turn-off to the north, which would be 410.

If he turned off to the south, it would be somewhat of a straight shot on that gravel road, but a long haul from the tar.  If he had turned off on 410, it's a little more of a zigzag if you are cutting back south and then having to cut back north.  So it's not someplace that I

have ever seen somebody get lost to the point that they are going to have to turn around and give them directions back to Pembina.

Q. And how far is the location where you arrested Shand from Highway 75?

A. Probably five miles more or less.

Q. Now, you were asked about sort of things in isolation. The fact that you saw an out of state or a Missouri license plate, that you got a Florida driver's license from Mr. Shand, that it was a rental vehicle. What's significant about those facts?

A. From out of the area, and especially that time of year, you don't see many people, if any, that are going to be in that particular area that close to the border, especially after a storm of that magnitude.

Q. And when you are doing your patrol work and looking for organized crime, do you look at things in isolation?

A. No, ma'am. We are trained to use a totality of circumstances where every individual, articulable fact builds up to a point of reasonable suspicion near the border.

Q. And is that what you were doing?

A. Yes, ma'am.

Q. And is your testimony today that you had reasonable suspicion to make the stop?

A.   Yes, ma'am.

MS. PROVINZINO:  No further questions, Your Honor.

THE COURT:  Re-cross.

MR. MORRISON:  Just one second, Your Honor.

(Discussion off the record between Mr. Morrison and Mr. Shand)

**RECROSS EXAMINATION**

BY MR. MORRISON:

Q.   You talked about how somebody could have ended up in this area different ways.  You have no idea how somebody ended up up there?  You have no idea how Mr. Shand ended up up there; correct?

A.   No, I don't.

Q.   You are not spending every day all day long hanging out at the gas plant; correct?

A.   Not all day every day, no, sir, but I'm in that area quite often.

Q.   Yeah, so you don't know if one person before Mr. Shand, 100 people before Mr. Shand got lost up there because you are not there all the time?

A.   No, sir, but in 14 years, that's my main route and the main area that I will patrol.  Sometimes twice, three times a day, four times a day I'm traveling by that area.

Q.   Yeah, and I want to ask you when you approached Mr. Shand's vehicle, he -- did you ask him for his driver's

license?

A.   Yes, sir.

Q.   Okay.  What happened next?

A.   I believe he handed me his driver's license and some other, like I said, documentation.  I can't remember if it was an insurance card.  I thought he had some more documentation with him.  And that's all I can recall.

Q.   Okay.  One second, Your Honor.

          (Discussion off the record between Mr. Shand and Mr. Morrison)

          MR. MORRISON:  Thank you.  I have no further questions.

          THE COURT:  Re-redirect?

**FURTHER REDIRECT EXAMINATION**

BY MS. PROVINZINO:

Q.   I think this has already been asked, but you -- or I -- just pulling everything together, you were asked you don't exactly know how Mr. Shand arrived there; is that fair?

A.   No, I -- I saw him approach the turn north to the gas plant from the west on I believe it was 409, which would -- it's either 409 or 408, which would have been the next gravel road that would have been further south from 410.

Q.   Is there anything significant about his approach to that location?

A.   From that particular road, the big things would have

been he would have come from 75 more than likely.  He would have turned off before hitting the turnoff to Pembina.  If he had gone further north, he could have missed that turnoff, but like I said, he -- it would have been quite a zigzag to get over to the gas plant if he had gone north of that turnoff.

Q.  Now, if he'd been coming from 75, would that have taken him to a legal port of entry?

A.  You mean to where the arrest was made or --

Q.  To a border crossing.

A.  If he had continued north on 75, there's a T intersection, I believe it's 175 or 171, that cuts across from 75 to Pembina where the bridge is to cross over into North Dakota.  If you miss that turn to go to Pembina, you end up at a dead end, which is an old port of entry in Noyes, Minnesota --

Q.  Okay.

A.  -- where there's a gate that goes across the old Highway 75 crossing.

Q.  And would those have been bigger paved roads at the time?

A.  Yes.

Q.  Okay.  And you were -- I think in your 14 years, have you seen that type of vehicle with out of state plates, unmarked, its size, without the tools in it in that location

in that type of -- time of the year?

A.  No, ma'am.  That's not a vehicle that we see at all in that -- in that area that I've observed.

MS. PROVINZINO:  No further questions, Your Honor.

THE COURT:  Mr. Morrison?

MR. MORRISON:  Done, Your Honor.  Thank you.

THE COURT:  All right.  Can the witness be excused?

MS. PROVINZINO:  Yes, Your Honor.

THE COURT:  Government rests?

MS. PROVINZINO:  Yes, the Government has no further testimony or evidence.

THE COURT:  Mr. Morrison, can the witness be excused?

MR. MORRISON:  Yes, Your Honor.

THE COURT:  Defendant rests?

MR. MORRISON:  Yes, Your Honor.

THE COURT:  All right.  You're free to go.

Do you want additional briefing?  You alluded to that earlier.

MR. MORRISON:  I certainly do, Judge.

THE COURT:  Okay.

MS. PROVINZINO:  That was my anticipation, in conversations with Mr. Morrison, that he would be likely ordering the transcript --

THE COURT:  All right.  Well --

MS. PROVINZINO:  -- and requesting a briefing schedule.

THE COURT:  -- are you going to order a transcript?

MR. MORRISON:  I think my office is the only one that's funded right now, so I guess I'm ordering these days.

THE COURT:  All right.  14-day?

MR. MORRISON:  That's fine, Your Honor.

THE COURT:  Okay.  After you receive the transcript, how long do you need?  Two weeks?

MR. MORRISON:  Yes, please.

THE COURT:  All right.  All right.  Then defense will order a 14-day transcript.  Upon receipt of the transcript, they'll have 14 days to file their memorandum.

How much after receipt of the defendant's memorandum?

MS. PROVINZINO:  The same amount, Your Honor.

THE COURT:  Two weeks?

MS. PROVINZINO:  I'll try to do it more quickly than that, but two weeks will be great.

THE COURT:  All right.  The schedule will be reflected in the comment section of the minute entry.

Anything else today from the Government?

MS. PROVINZINO:  Nothing further from the

Government, Your Honor.

THE COURT: Anything else from defense?

MR. MORRISON: No, Your Honor. Thank you.

THE COURT: All right. We're adjourned. Thank you.

(Court adjourned)

*     *     *

I, Erin D. Drost, certify that the foregoing is a correct transcript to the best of my ability from the official digital recording in the above-entitled matter.

Certified by: *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR