UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-40(02) (JRT/LIB)

UNITED STATES OF AMERICA,

　　　　Plaintiff,

　　v.

STEVE ANTHONY SHAND,

　　　　Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS**

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Michael P. McBride and Laura M. Provinzino, respectfully submits this response to the Defendant's Memorandum in Support of his Motion to Suppress (ECF No. 102). In his post-hearing briefing, the defendant challenges the reasonableness of the traffic stop. As supported by the testimony at the motions hearing and the facts and arguments presented here, the stop was reasonable. The motion to suppress should be denied.

## FACTUAL BACKGROUND

At the motions hearing, Border Patrol Agent Christopher Oliver testified at length regarding his decision to stop the defendant on January 19, 2022, while the defendant was smuggling human beings across the Canada/United States border. Agent Oliver's testimony is reflected in the official transcript of the motions hearing, (ECF No. 100) ("Mot. Tr.").

### a. Border Patrol Agent Oliver was very familiar with the area of the stop.

Agent Oliver testified that he has lived in and around Kittson County, Minnesota, for over 14 years, working as a United States Customs and Border Patrol (USCBP) Agent. (Mot. Tr. at 10-11.)  His area of responsibility includes a 15-20 mile stretch of border between Pembina, North Dakota, and Lancaster, Minnesota. (*Id.*)

Agent Oliver testified that he patrolled the area around the back-country intersection of 180th Street and 410th Avenue North two-to-four times every day for 12 years at the time of the stop. (*Id.* at 54.)  He was very familiar with the pattern-of-life and type of people and vehicles that would occasionally travel the remote gravel and clay roads. (*Id.* at 16-18.)  The roads in that area are poorly maintained, dirt roads. (*Id.* at 16-17.)  The intersection is frequently impassable; the roads north and west of the intersection are allowed to "plug" with snow in the winter. (*Id.*)  Agent Oliver knows the only resident in the area, who wintered in California. (*Id.* at 17.)  Although agricultural workers and hunters may travel that road—infrequently— during the summer and fall, they are absent in the winter. (*Id.* at 28-29.)

This leaves only the Great Lakes Gas Transmission pump station ("the gas plant") as a destination near the intersection in the deep winter. (*Id.* at 16.)



Contractors who maintain the gas plant drive "big work trucks" loaded with tools, toolboxes, diesel tanks, and the like. (*Id.* at 20.) They wear uniforms and their vehicles are typically labeled with company logos. (*Id.* at 20 and 27.) They are not at the facility frequently in the winter. (*Id.*)

Agent Oliver testified that the intersection is not an area anyone would ever get lost at on their way to Pembina or any other destination. (*Id.* at 52-53.) In fact, the area would not even show up on a mapping service if an

---

[1] From Google Maps, accessed on June 13, 2024 at:
https://www.google.com/maps/place/Great+Lakes+Gas+Transmission/@48.9917511,-97.0679919,3138m/data=!3m1!1e3!4m9!1m2!2m1!1spembina!3m5!1s0x52c165503f1f8a29:0xef770d2f32e8a62b!8m2!3d48.9901691!4d-97.0602513!16s%2Fg%2F1tg4l0py?entry=ttu

individual were heading to Winnipeg. (*Id.* at 31.) The intersection is miles

from any other road or destination. (*Id.*)

[2]

It is remote.

**b. Agent Oliver was sent to the intersection specifically because CBP suspected human smuggling was happening there.**

Agent Oliver testified that in the 12 years before the defendant was

stopped, he had not ever seen overt signs of organized, regular smuggling in

that area. (*Id.* at 16.) That changed in December 2021 and January 2022,

however. On Wednesday, December 22, 2021, CBP Agents first saw boot

tracks crossing the border and leading directly to the intersection of 180th

Street and 410th Avenue North. (*Id.* at 18.) On Wednesday, December 29, they

---

[2] *Id.*

observed the same pattern. (*Id.*) On Wednesday, January 12, they found more fresh boot prints leading to the same intersection. (*Id.*) One set of boot prints was consistent across all three events. (*Id.* at 18-19.) Agents also recovered a backpack with a price tag in Indian Rupees at the intersection—a highly unusual item to find in far northern Minnesota. (*Id.* at 19.)

Because CBP Agents had observed a consistent, clear pattern of apparent human smuggling taking place at the intersection of 180th Street and 410th Avenue North, Agent Oliver was sent to the intersection on the morning of Wednesday, January 19, 2022. (*Id.* at 22.) So high was the CBP's suspicion of human smuggling at the intersection on Wednesdays, that Agent Oliver was sent there despite temperatures 20-30 degrees below zero, two-or-three-foot snow drifts, and recent blizzard warnings. (*Id.* 21-23.)

### c. Agent Oliver developed reasonable suspicion the defendant was engaged in human smuggling.

On his way to the intersection, Agent Oliver had to navigate extreme road conditions. (*Id.*) It took him half-an-hour longer to get to the intersection than normal and he did not see any other vehicles on his way. (*Id.* at 24.) As he approached the intersection from the south, he observed a vehicle turn onto the road in front of him and drive past the two entrances to the gas plant without stopping. (*Id.* at 25.) At first, because of the conditions and the rare traffic in that area, he thought the vehicle might actually be another CBP

patrol sent to investigate human smuggling at the intersection. (*Id.*) He quickly ruled that out.

To Agent Oliver, "that area up there, there's no reason for an out of state plated vehicle to be in that area unless it's going to be gas plant related at that time of year." (*Id.* at 29.) But he quickly ruled that out, too. Agent Oliver observed the vehicle was a large, white, panel van that was ill-suited to the conditions. (*Id.* at 25.) The van was unmarked. (*Id.*) It had out-of-state plates from far-off Missouri. (*Id.* at 26.) It had three occupants, including one in the back. (*Id.*) An occupant in the back was significant to Agent Oliver because it showed the van was a passenger van—not a utility van. (*Id.*) Agent Oliver worried more people may be concealing themselves in the large van. (*Id.* at 27.) The van did not stop at the plant. Rather, it slowly looped through the intersection—the precise place he suspected people were being smuggled from—and drove back past the two entrances to the gas plant without stopping. (*Id.*)

This driving path, the type of van, the lack of logos, the number of occupants, and the extreme road and weather conditions that time of year ruled out the gas plant as a destination in Agent Oliver's mind. (*Id.* at 29.) So, he stopped the van to further investigate what he had been sent to the intersection to investigate in the first place: human smuggling. (*Id.*)

### d. Agent Oliver's suspicion is deepened and confirmed.

Agent Oliver called in the plates and learned that it was a rental vehicle, which is another red flag in smuggling cases.  (*Id.* at 27-28.)  When Agent Oliver spoke to the driver, he was given a Florida driver's license.  (*Id.* at 30.) The driver, Mr. Shand, gave non-answers to direct questions about his business in the area.  (*Id.*)  The driver was not in a uniform and was poorly dressed for the weather, indicating to Agent Shand that he was not in the area to do work.  (*Id.* at 32.)  When he finally answered, the defendant said they are traveling to Winnipeg—a facially implausible explanation to Agent Oliver.  (*Id.* at 32.)  The passengers appeared to be of Indian ancestry and struggled with English.  (*Id.*)  They have their boots off as if they are warming their feet from being outside for a prolonged period.  (*Id.* at 33.)  Neither passenger had a stamp in their passport from a port of entry.  (*Id.* at 33, 35.) One of the passengers said he was coming from Winnipeg. (*Id.* at 33.)  They only had portable backpacks on them.  (*Id.*)  Having developed probable cause, Agent Oliver arrested Mr. Shand for human smuggling.  (*Id.* at 37.)

### ARGUMENT

The defense raises a single basis for suppression: that Agent Oliver did not have "reasonable suspicion" to initiate a stop of the defendant.  (ECF Nos. 83 and 102.)   Because Agent Oliver developed significant evidence the defendant was engaged in human smuggling before he stopped the defendant's

van, he had reasonable suspicion, the stop was lawful, and the defendant's motion should be denied.

Traffic stops require reasonable suspicion and are governed by the principles laid out in *Terry v. Ohio*, 392 U.S. 1 (1968).  In the context of policing illegal entrances at the United States' borders, the Court has held:

> [B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

*United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975).  The defendant argues *Brignoni-Ponce* articulated a limited list of factors that may justify a stop.  (ECF No. 102 at 8.)  On the contrary, the Court specifically laid out a totality-of-the-circumstances test.  *Brignoni-Ponce*, 422 U.S. at 885 n.10.  "Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area."  *Id.* at 884.  Consistent with *Terry*, agents need only have specific, articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion a vehicle may contain aliens who have entered the country unlawfully.  *Id.*

The defendant's reliance on the facts of *Brignoni-Ponce* is significantly misplaced.  There, the officers relied on a single factor: the apparent race of a car's occupants.  *Id.*  This case is more akin to *United States v. Jaime-Barrios*,

8

494 F.2d 455, 456 (9th Cir. 1974), cited in *Brignoni-Ponce* its prudence.  There, Agents observed a vehicle they did not recognize traveling faster than normal in a remote border area on dirt roads.  *Id*. at 456-57.  Given the Agent's experience with past smuggling in the area, this out-of-place vehicle was reason enough to briefly detain it.  *Id*.

Agent Oliver had a far greater factual basis even than the agents in *Jaime-Barrios* to ground his suspicion in this case.  He developed significant specific articulable facts to support his suspicion the defendant was smuggling aliens.  Nearly every Wednesday for a month CBP agents observed clear signs of human smuggling.  This was a recognizable pattern. The only reason Agent Oliver was at the intersection on a Wednesday in the first place was to investigate the CBP's suspicion of smuggling at that specific intersection on Wednesdays.

Agent Oliver knew no one should have been at the intersection.  He had driven by thousands of times and knew the area's pattern-of-life.  The weather was dismal with deep drifts.  The roads north and west were blocked.  The only resident was wintering in California.  Lost travelers never went there.  Agent Oliver carefully ruled out workers from the gas plant.  The van was unmarked. Its plates were from a distant state.  It had no tools and did not appear to be a typical contractor's vehicle.  It passed the gas plant without stopping—twice. Put simply, Agent Oliver saw a van that could hold many people at the

appointed place at the appointed time and it appeared to have no other business being there.  Under these circumstances, it was reasonable for him to briefly stop the van to identify its passengers and gather more information about its reason for being at the intersection.  The information he gathered only deepened his suspicion, giving him probable cause to arrest the defendant. Consequently, all evidence derived from the stop was properly gathered.

## CONCLUSION

Because the stop of the defendant's van fully accorded with the Fourth Amendment, there are no grounds to suppress any evidence derived from it. The defense's motion should therefore be denied.

Dated: June 17, 2024                          Respectfully submitted,

                                              ANDREW M. LUGER
                                              United States Attorney

                                              *s/Michael P. McBride*

                                              BY:  MICHAEL P. MCBRIDE
                                              Assistant United States Attorney
                                              Attorney Reg. No. 0397292