UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 22-cr-40(2) (JRT/LIB)

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | |
| | ) | **Steven Shand's Objections to** |
| vs. | ) | **Report & Recommendation** |
| | ) | |
| Steven Anthony Shand, | ) | |
| Defendant. | ) | |

## Introduction

Pursuant to 28 U.S.C. § 636(b)(1)(C) and D. Minn. L.R. 72.2(b)(1), Defendant Steven Shand respectfully submits these Objections to the Report and Recommendation issued in this case ("R&R"), (ECF 109), which suggests that the Court deny his pretrial motion to suppress the direct and derivative fruits of a January 19, 2022 traffic stop effected by law enforcement—in this case an agent of the United States Border Patrol (USBP). (ECF 83). For the reasons that follow, Mr. Shand respectfully requests that the Court sustain these Objections, and issue an order granting the above motion.

## Background

Much of the relevant background information may be found in the original motion and supporting memoranda, (ECF 83 & 102), as well as the government's responses, (ECF 88 & 106). Additional background was elicited during the motions hearing, (ECF 95), as reflected in an official transcript, (ECF 100) ("Mot. Tr.").

### A.    Charged Offenses

The case at hand implicates the Immigration and Nationality Act (INA), Pub. L. 82-414 (1952), *codified as amended at* 8 U.S.C. Ch. 12, §§ 1101-1537. The government has

1

charged Mr. Shand with a number of INA "alien smuggling" offenses under 8 U.S.C. § 1324(a)(1)(A)-(B); *see also* USSG § 2L1.1. (R&R, at 1-2). The charging document specifies the date January 19, 2022, (ECF 72), which coincides with the disputed stop-seizure, described next.

### B.   Stop-Seizure

On the above date, USBP Agent Christopher Oliver effected an official stop-seizure of the vehicle that Mr. Shand was operating. (R&R, at 5-6). The stated justification for the official stop-seizure was "suspicion of alien smuggling." (Mot. Tr., at 34).

### C.   Stop Area

The vehicular stop at issue was effected at an area near the northern boundary of Minnesota—which also forms the United States-Canada border—depicted in maps submitted by both parties, including as below:



(ECF 102, at 2).

Specifically, the stop-seizure occurred near the intersection of 410th Street and 180th Avenue in rural Kittson County ("Stop Area" depicted above). (R&R, at 4-5). The Stop Area is located approximately 4 to 5 miles from a major highway (Highway 75), from which it was conceded that travelers get lost from time to time. (Mot. Tr., at 44, 52). And the Stop Area is also approximately five miles from Pembina, which is adjacent to an interstate highway (I-29) and leads to urban centers both north (*e.g.,* Winnipeg) and south (*e.g.,* Grand Forks and Fargo). (Mot. Tr., at 46):



(ECF 102, at 3).

The Stop Area is "relatively isolated and remote," consisting mainly of "either gravel roads or clay roads." (R&R, at 4). It contains scattered farmsteads, hunting cabins, and residences. (R&R, at 4; Mot. Tr., at 15). The "only big landmark" in the Stop Area is an industrial gas plant, containing multiple buildings, smokestacks, and other heavy equipment. (Mot. Tr., at 19).

### D.     Proffered Suspicion

According to USBP Agent Oliver, the proffered justification for the stop-seizure at issue was "reasonable suspicion" of INA-prohibited "alien smuggling" activity on the part of Mr. Shand. (Mot. Tr., at 34, 53). For evidence, the following was offered:

### 1.     Footprint "Pattern"

The principal reason for Agent Oliver's presence in the vicinity was a "pattern" of evidence suggestive of unlawful border crossings at or near the Stop Area, described by the R&R as follows:

> In December of 2021 and January 2022, Agent Oliver and other Border Patrol Agents began noticing a pattern of evidence near the area where 410th Street intersects with 180th Avenue in Kittson County indicating that individuals had recently used that area to illegally cross the border between Canada and the United States. Specifically, agents found "fresh footprints leading away from the Canadian border to that exact intersection." ***Over the course of three weeks, the agents discovered that the fresh footprints appeared on Wednesday of each week.***

(R&R, at 3 (citations omitted)). However, the record actually states footprints were observed ***three out of the four*** pre-stop Wednesdays, rather than an unbroken streak of consecutive Wednesdays as indicated by the R&R passage above:

> Q. Now you said you were observing, over that month-long period, what appeared to be an organized human smuggling route. Describe what you mean by that.
>
> A. So it -- there was a distinguished pattern midweek where * * * we'd find fresh footprints leading away from the Canadian border to that exact intersection. I believe the first call-in report of it was on the 22nd of December. And then our agents logged sign being cut there again on the 29th. Then after that, I believe the -- the next event was on the 12th, and then there was the apprehension that was on the 19th. ***So three out of four Wednesdays leading up to the arrest*** * * *.

4

(Mot. Tr., at 18 (emphasis added)).

### 2.     Weather Conditions

On the day before the disputed stop-seizure—January 18, 2022—the area had been affected by a major winter storm, including snow, wind, and very low temperatures. (Mot. Tr., at 20-21). Conditions had improved by the following day—Wednesday January 19, the day of the disputed stop-seizure—but remained quite difficult for travel, particularly on the gravel roads such as Stop Area. (Mot. Tr., at 21-23). Wind-chill-adjusted temperatures were dangerously low as well. (Mot. Tr., at 23-24).

The R&R states Agent Oliver was instructed to travel to the Stop Area on the date in question "because January 19, 2022 was a Wednesday, and the previously discovered footprints at the intersection had been discovered on the previous three Wednesdays." (R&R, at 4-5). However, as noted above, the testimony was that footprints had been detected in the Search Area "three out of four Wednesdays leading up to the arrest." (Mot. Tr., at 18).

### 3.     Typical Traffic

USBP Agent Oliver testified to having never observed a rental passenger van in the Stop Area in his 14 years of patrolling the vicinity; however, it was not unusual for similar vehicles with out-of-state license plates to be operating in the area, for various commercial and recreational reasons:

> Q. Now based on your extensive, you know, experience driving kind of on a day-to-day basis, do you typically see rental vehicles of that type up in your area of responsibility?

> * * *

A. It's possible, but your out of state plates in that area would be more North Dakota, Minnesota -- or I'm sorry – the plates you'd see would be North Dakota, Minnesota. We get some from out of state, but it would be more during farm traffic season where you are going to have workers that come up to work the different farms. Maybe during hunting season where you have a bear season or a deer season going on, we'll see out of state plates. But those are going to be more in your wildlife management areas, public hunting grounds, and then near your farming areas where your workers are going.

That area up there there's no reason for an out of state plated vehicle to be in that area ***unless it's going to be gas plant related*** at that time of year. And we don't see very much for subcontractors that time of year.

(Mot. Tr., at 28-29 (emphasis added)).

### 4.    Subject Vehicle

Upon approaching the Stop Area on January 19, USBP Agent Oliver observed a white vehicle ("Subject Vehicle") traveling north toward the gas plant. (Mot. Tr., at 24-25). At first he thought it might be another USBP patrol vehicle, but on closer approach he identified the Subject Vehicle as a "large white panel van." (Mot. Tr., at 25). Agent Oliver:

> observed [the Subject Vehicle] do a three-point turn at the intersection of 180th and 410, and then proceed back south. That it was moving at a slower rate than what you'd usually see on traffic. And I noticed that it was occupied by three occupants that I could see, and had an out of state license plate [.]

(Mot. Tr., at 25). He "maybe" noticed that Mr. Shand is of African-American lineage, but claimed not to have used that information as reasonable suspicion for the eventual vehicular stop. (Mot. Tr., at 46).

Agent Oliver stated the turnaround signaled to him the Subject Vehicle had no "business" with the nearby farmsteads, residences, or gas plant. (Mot. Tr., at 25). And the absence of commercial signage on the vehicle plus the observed presence of a passenger in the backseat area indicated "it was probably a passenger style vehicle on the inside."

(Mot. Tr., at 26-27). Though this was mere supposition until the Subject Vehicle had been stopped and inspected. (Mot. Tr., at 26-27).

### E.    Official Stop-Seizure

At all events, USBP Agent Oliver conducted an official stop of the Subject Vehicle, leading to the arrest of the driver Defendant Mr. Shand, elicitation of statements from Mr. Shand, and seizure of items to be used as evidence at trial, including the digital contents of mobile phone devices. (ECF 102, at 6). The stated justification for the Stop was the Subject Van making a turnaround maneuver where footprints had previously been observed:

> [T]he exact intersection where we had had a pattern of traffic, almost within -- traffic might have been within ten yards of that intersection but always came to that intersection, made that turnaround pretty significant at that exact spot.

(Mot. Tr., at 26).

At the same time, USBP Agent Oliver had to concede there were no observations of the Subject Vehicle doing anything that could reasonably be characterized as illegal:

> Q. Instead, you saw a van that you didn't recognize doing nothing illegal, as far as you saw, driving down the road; correct?
>
> A. I saw a van that I did not recognize with an out of state plate driving on poor road conditions after a significant storm go to a dead end near the border and turn around.
>
> Q. Did you see him doing anything illegal?
>
> A. No, sir.

(Mot. Tr., at 47).

F.     R&R

Mr. Shand brought a motion to suppress the direct and derivative fruits of the above official stop-seizure, as having been effected without the requisite showing of reasonable suspicion. (ECF 83). The R&R correctly identifies the above fact pattern as being governed by the "roving patrol" line of cases, involving USBP-initiated vehicular stops upon inland roads. (R&R, at 7-8). The R&R suggests USBP Agent Oliver did make the required showing to justify the vehicular stop at issue, based primarily upon physical proximity:

> The Subject Vehicle's proximity to the previously discovered evidence demonstrating a pattern of illegal border crossing is a strong indicator of the reasonable, articulable suspicion necessary to initiate a traffic stop of the Subject Vehicle.

(R&R, at 8). In addition, the R&R cites: (i) unlikelihood of a lost traveler; (ii) out-of-state license plate; (iii) seating capacity of vehicle. (R&R, at 9). Accordingly, the R&R suggests that the Court deny Mr. Shand's motion to suppress. (R&R, at 10). Mr. Shand now respectfully objects to the R&R, as follows:

## Objections

1.     **Mr. Shand respectfully objects to R&R findings relating to the "pattern" of footprints observed at the Stop Area.**

As described above, the primary evidence offered by USBP law enforcement to justify the challenged vehicular stop involved a "pattern" of footprints, previously observed at or near the Stop Area on Wednesdays.

The R&R states, in relevant part: the "January 19, 2022 [date of challenged stop] was a Wednesday, and the previously discovered footprints at the intersection had been discovered on the previous three Wednesdays." (R&R, at 4-5; *accord* R&R, at 3 ("Over

8

the course of three weeks, the agents discovered that the fresh footprints appeared on Wednesday of each week.")).

However, the hearing testimony was that footprints had been detected in the Search Area "three out of four Wednesdays leading up to the arrest." (Mot. Tr., at 18). Not each of the three prior Wednesdays, as the R&R states. (R&R, at 3 & 4-5).

The factual error is important, both under the R&R's internal reasoning and the applicable case law, as discussed in more detail below. Mr. Shand respectfully objects to the R&R on this ground, and requests that the Court make the appropriate factual correction in its final order.

## 2. Mr. Shand respectfully objects to the R&R's application of the legal standard governing inland "roving patrol" vehicular stops.

The R&R correctly notes the fact pattern at issue here is governed by the "roving patrol" line of decisions, involving USBP-initiated vehicular stops upon inland roads, as opposed to the stops at the border or equivalent entry points. (R&R, at 7-8). The leading case on this topic states the applicable legal standard as follows:

> Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*United States v. Brignoni-Ponce,* 422 U.S. 873, 884 (1975). To guide courts, the *Brignoni-Ponce* decision lists a number of relevant factors that inform the reasonable-suspicion inquiry in this particular factual-legal context, including: (1) area's proximity to the border; (2) characteristics of area; (3) usual traffic patterns of road; (4) agent's experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects of the vehicle;

(7) information about recent illegal border crossings in the area; (8) the number of passengers and their appearance and behavior. *Id.* at 884-85; *accord, e.g., United States v. Freeman,* 914 F.3d 337, 342-47 (5th Cir. 2019) (listing and applying factors to facts at hand).

The inquiry does call for examination of the totality of circumstances. *United States v. Arvizu,* 534 U.S. 266, 273 (2002). However, a mere "hunch" will not suffice to justify an official vehicular stop. *Id.* at 274. And it is essential to conduct the totality-of-circumstances inquiry through the lens of the *Brignoni-Ponce* factors; so as to account for *all* the relevant considerations, and not merely those that serve to affirm or pardon the actions of law enforcement. *See, e.g., Freeman,* 914 F.3d at 342-47.

Here, the R&R correctly states the *Brignoni-Ponce* factors. (R&R, at 8). However, in conducting the totality-of-circumstances analysis, the R&R relies primarily upon just one such factor, *i.e.,* information about recent illegal border crossings in the area:

> The fact that border patrol agents had recently discovered a pattern of evidence demonstrating that individuals had illegally crossed the border from Canada into Mexico[1] at the exact location of the January 19, 2022, traffic stop, contributes significantly to the existence of reasonable, articulable suspicion necessary to stop the Subject Vehicle. The Subject Vehicle's proximity to the previously discovered evidence demonstrating a pattern of illegal border crossing is a strong indicator of the reasonable, articulable suspicion necessary to initiate a traffic stop of the Subject Vehicle.

(R&R, at 8 (citations omitted)). And as observed earlier, the R&R used a factually incorrect understanding of as to the nature and extent of the "pattern," *i.e.,* claimed evidence of illegal border crossings on three consecutive Wednesdays, when in reality there is no true

---

[1] Apparent error in original; presumably "United States" is intended.

"pattern" as the term is normally used, but rather footprints observed on three of the prior four Wednesdays. *Supra* Objection 1.

Mr. Shand therefore respectfully objects to the R&R with respect to its application and non-application of the *Brignoni-Ponce* factors to the facts at hand, and respectfully suggests the Court adopt an analysis along the following lines:

*(i). Recent Illegal Border Crossings.* USBP detection of footprints suggestive of recent illegal border crossings can be a factor in the *Brignoni-Pence* reasonable-suspicion analysis. *United States v. Cortez,* 449 U.S. 411, 420 (1981). However, the mere presence of a vehicle near a footprint area cannot serve as the sole basis for vehicular stop-seizure; such reasoning would broadly justify law enforcement intrusions of any and all motorists who happen to be driving along a given stretch of roadway. *See Cortez,* 449 U.S. at 420-21 (law enforcement theory reasonably limited targets to particular vehicle types, traveling in particular area, at particular time of day; thus limiting universe of targets to just one); *see also, e.g., Johnson v. Phillips,* 664 F.3d 232, 237 (8th Cir. 2011) ("[A] person's presence in a suspicious location does not, in and of itself, provide law enforcement with a reasonable, articulable suspicion" to conduct an investigatory stop) (citing *Brown v. Texas,* 443 U.S. 47, 52 (1979)).

Here, as noted above, the claimed "pattern" of footprint observations was born of low sample size (*i.e.,* mere three observations) and disjointed frequency (*i.e.,* three out of four previous Wednesdays)—such that it was no actionable pattern at all. Even if it were otherwise, the Fourth Amendment does not permit law enforcement to stop any and all vehicles seen operating at or near such an area, based merely upon a broad inferential

11

pattern. *See, e.g., Cortez,* 449 U.S. at 414, 420-21 (in using inferential pattern to make a stop, law enforcement set temporal and spatial conditions, such that only 1 of approximately 20 passing vehicles were subject to official stop). Hence, the primary justification for the vehicular stop—offered by both the government and R&R—actually cuts *against* the necessary reasonable and particularized suspicion.

*(ii). Characteristics of Area.* The USBP agent encountered the Subject Vehicle at the Stop Area, located on a gravel road approximately one-half mile from the Border. (Mot. Tr., at 14-18). Aside from the above "pattern"—which really was no pattern at all, as just discussed—the area was *not* known as a smuggling route. (Mot. Tr., at 16).

In addition, the Stop Area is located just a few miles from nearby towns, including Pembina which is adjacent to a major interstate highway system. The USBP officer conceded that travelers have been known to get become lost; and though he claimed travelers would not get lost in that particular area, the very nature of being lost means one has wandered in an unpredictable fashion, particularly in the aftermath of a winter storm such occurred here.

On balance, then, the characteristics of the Stop Area fail to support the requisite reasonable suspicion to justify the stop. *See, e.g., United States v. Golab,* 325 F.3d 63, 66 (1st Cir. 2003) (reasonable suspicion for vehicular stop lacking, in part because stop was conducted at parking area separate from area where suspicious activity had taken place).

*(iii). Usual Traffic Patterns.* The stop occurred in the wake of major winter storm, and the USBP agent indicated that farm workers or recreational hunters would not be expected in the area under such conditions. However, it was conceded that contractors

might well be in the area to service the industrial gas plant. The USBP agent suggested that the mere fact the Subject Vehicle approached the industrial gas plant and turned around indicated it had no "business" at the gas plant; however, this is even more speculative and implausible than the claim that a lost traveler could not have wandered into the Stop Area after a winter storm. The evidence was, the industrial gas plant is a large facility with multiple buildings; and contractor who is unfamiliar with the area and driving in the aftermath of a winter storm could easily miss the turnoff to the correct entry road. This factor cuts strongly against a finding or reasonable suspicion. *See, e.g., Freeman,* 914 F.3d at 345 ("it simply is not unusual that the particular route chose by a driver does not coincide with a route Border Patrol Agents consider more direct or comment" and "this is especially true when the driver is from another part of the state").

(iv). *Driver Behavior.* Under *Brignoni-Pence,* driver behavior "such as erratic driving or obvious attempts to evade officers can support a reasonable suspicion." 422 U.S. at 885. However, by the USBP officer's own account, the operator Mr. Shand merely drove to an intersection, turned around, and proceeded to drive the other direction. Though the agent stated it made no difference in the stop calculus, the USBP agent did note prior to the stop that Mr. Shand is of African American lineage, which of course is not a permissible consideration. In any event, nothing about the driver or his behavior was suspicious, and this factor cuts against reasonable suspicion as well.

(v). *Aspects of Vehicle.* The Supreme Court has held that certain observations concerning the vehicle itself might be relevant in the reasonable-suspicion analysis, such as whether the particular make/model of vehicle is known to be "frequently used for

13

transporting concealed aliens," or whether the particular vehicle in question contains an "extraordinary number of passengers" or "persons trying to hide." 442 U.S. at 885. Here, the USBP agent noted the Subject Vehicle was "large," but evidently no more so than contractor vehicles that were known to traverse the area. The agent observed just two passengers in the Subject Vehicle, and reported no suspicious activity by either. (Mot. Tr., at 26).

In addition, as support for the stop, the government and R&R cite the out-of-state license plates observed upon the Subject Vehicle. But the USBP agent conceded that out-of-state plated vehicles are not abnormal that time of year, at least when the vehicle is "gas plant related." (Mot. Tr., at 28-29). And here, law enforcement executed the stop prior to making observations that would have indicated whether the Subject Vehicle was or was not "gas plant related."

Accordingly, in the case at hand, the observed aspects of the vehicle fail to raise a reasonable suspicion to justify the vehicular stop at issue.

*(vi). Agent Experience.* As already noted, while the USPB agent had many years of patrol experience, he had very little experience in smuggling detection. (Mot. Tr., at 16 ("So as a whole, our area of responsibility historically has been pretty slow. * * *  And it was the first time in my 14 years up there * * * that we overtly saw what we thought was an organization using that area on a regular basis.")). Accordingly, this factor cuts against reasonable suspicion as well. *See, e.g., Freeman,* 914 F.3d at 345-46 (where USBP agent had eight years on the job, but only "two or three successful" roving patrol stops over that period, experience factor "bears little weight in the analysis").

14

Putting all the factors together, and contrary to the R&R suggested outcome, the circumstances presented here reveal nothing more than the mere presence of the Subject Vehicle in a suspicious area, which is insufficient to justify the vehicular stop at issue here. *Johnson,* 664 F.3d at 237 ("[A] person's presence in a suspicious location does not, in and of itself, provide law enforcement with a reasonable, articulable suspicion" to conduct an investigatory stop) (citing *Brown v. Texas,* 443 U.S. 47, 52 (1979)). Mr. Shand respectfully objects to the contrary application of law to fact suggested by the R&R.

## Conclusion

For the above reasons, Mr. Shand respectfully requests that the Court sustain the objections herein, and issue an Order: (1) granting his motion to suppress (ECF 83); and (2) suppressing the direct and derivative fruits of the challenged stop-seizure.

Dated:  August 6, 2024                    Respectfully submitted,

*s/ Aaron Morrison*
_____
AARON J. MORRISON
Attorney ID No. 0341241
Attorney for Mr. Shand
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

15