UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-40 (JRT/LIB)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

(1) HARSHKUMAR RAMANLAL PATEL
a/k/a "Dirty Harry,"
a/k/a Harry Patel,
a/k/a Param Singh,
a/k/a Haresh Rameshlal Patel,
a/k/a Harshkumar Singh Patel, and

(2) STEVE ANTHONY SHAND,

    Defendants.

GOVERNMENT'S MOTION IN LIMINE TO ADMIT MESSAGES BETWEEN DEFENDANT SHAND AND HIS WIFE

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, Assistant United States Attorney Michael P. McBride and Trial Attorney Ryan Lipes, respectfully submits this motion in limine to admit messages between Defendant Shand and his wife.

Defendant Shand's wife, Co-Conspirator 1 ("CC-1"), was an active participant in the alien smuggling conspiracy at issue in this indictment. CC-1 helped plan travel for smuggling events, received and deposited money for her participation in the smuggling conspiracy, and flew to Canada and drove

1

migrants from Winnipeg to the Canadian border, where her husband was waiting to pick them up and transport the migrants to Chicago.

Shand and CC-1 documented much of their planning and involvement in text messages and WhatsApp communications. These messages are admissible non-hearsay statements between co-conspirators. Moreover, although marital communications are often protected by privilege, clear exceptions apply when spouses are "partners in crime." For these reasons, the messages between Shand and CC-1 are admissible at trial.

I.  **STATEMENT OF THE FACTS**

Beginning in December 2021, Defendant Shand conspired with Defendant Patel and others to smuggle aliens across the Canadian border and transport them within the United States, primarily to Chicago. Following Patel's instruction, Shand's role was primarily to pick up migrants on the U.S. side of the Canadian border and drive them to their destination point.

Throughout this conspiracy, Shand's wife, Co-Conspirator 1 ("CC-1"), actively participated in the conspiracy. As outlined below, CC-1 played several roles:

- CC-1 helped arrange and purchase travel for Shand's trips to pick up migrants;
- CC-1 received cash payments from Patel;

- CC-1 traveled to Canada and assisted in transporting migrants from Winnipeg to the Canadian border, with Shand waiting for them on the U.S. side of the border.

The evidence shows CC-1's involvement during all five known human smuggling events:

a. **December 10-12, 2021**

During the first smuggling event around December 10-12, 2021, CC-1 discussed travel arrangements with Shand and sent him a rental car option, with a pick-up location in Minneapolis and a drop-off location at Chicago O'Hare Airport. CC-1 also sent flight options to Minneapolis on Frontier Airlines to Shand.

Throughout, Shand kept CC-1 updated on the events unfolding, including a discussion about how dangerous—even deadly—it was for the migrants to walk in extreme cold weather:

| From | To | Date | Time (CST) | Message |
|---|---|---|---|---|
| Shand | CC-1 | 12/11/21 | 10:48 PM | He sat [sic] they walking |
| CC-1 | Shand | 12/11/21 | 10:48 PM | Oh |
| Shand | CC-1 | 12/11/21 | 10:48 PM | It's 16 degrees |
| CC-1 | Shand | 12/11/21 | 10:48 PM | That's messed up |
| Shand | CC-1 | 12/11/21 | 10:48 PM | They going to die before they get here |
| CC-1 | Shand | 12/11/21 | 10:48 PM | For real |
| CC-1 | Shand | 12/11/21 | 10:49 PM | He didn't say where they are? |
| Shand | CC-1 | 12/11/21 | 10:49 PM | It's cold |

As she made clear in her messages to Shand, CC-1 expected to get paid for her work in the conspiracy:

| From | To | Date | Time (CST) | Message |
|---|---|---|---|---|
| CC-1 | Shand | 12/14/21 | 1:33 AM | How much of the money is mine? |
| Shand | CC-1 | 12/14/21 | 1:33 AM | I have to win it first |
| CC-1 | Shand | 12/14/21 | 1:34 AM | Not talking about that<br>The money u got from harry?<br>U said u were going to give me something for planning it for you |

**b. December 21-23, 2021**

CC-1 again helped arrange travel for Shand for the second smuggling event around December 21-23, including sending him his boarding pass with a QR code for his flight to Minneapolis on Delta. CC-1 also provided Shand with his hotel information in Grand Forks, ND. Messages between Shand and Patel show that CC-1 was involved in accepting payment from Patel for their work:

| From | To | Date | Time (CST) | Message |
|---|---|---|---|---|
| Shand | Patel | 12/22/21 | 9:08 PM | Did you drop off that 2,500?<br>My rib bone is waiting on it |

In context, "My rib bone" appears to reference Shand's wife, CC-1. Later that night, Patel tells Shand to tell CC-1 that he was heading over with money:

| From | To | Date | Time (CST) | Message |
|---|---|---|---|---|
| Patel | Shand | 12/23/21 | 1:10 AM | Hey I am going there<br>After 20 minutes<br>Tell your wife |

4

Later that day, a $3160 cash deposit was made into a checking account in CC-1's name.

### c. December 28-30, 2021

During the third smuggling event on December 28-30, 2021, CC-1 again helped plan Shand's travel, including sending him his boarding pass to travel:



Afterwards, Shand and CC-1 again discuss whether Harry [Patel] has paid:

| From  | To    | Date     | Time (CST) | Message                       |
|-------|-------|----------|------------|-------------------------------|
| Shand | CC-1  | 12/30/21 | 3:53 PM    | Harry no check you?           |
| CC-1  | Shand | 12/30/21 | 3:58 PM    | No                            |
| Shand | CC-1  | 12/30/21 | 3:58 PM    | Ok                            |
| CC-1  | Shand | 12/30/21 | 3:58 PM    | He said he was going to come? |
| Shand | CC-1  | 12/30/21 | 3:58 PM    | Today                         |

That same day, a $1920 cash deposit was made into a joint bank account for CC-1 and Shand.

**d. January 11-13, 2022**

   CC-1 became directly involved in moving migrants during the January 11-13, 2022, smuggling event, flying to Canada and driving migrants from Winnipeg to the U.S./Canada border.

   A few days before the smuggling event, CC-1 messaged with Shand about how much money they would receive for the work:

| From  | To    | Date   | Time (CST) | Message                  |
|-------|-------|--------|------------|--------------------------|
| Shand | CC-1  | 1/8/22 | 7:57 PM    | He said8000              |
|       |       |        |            | [outgoing call]          |
| CC-1  | Shand | 1/8/22 | 8:00 PM    | For what?                |
| Shand | CC-1  | 1/8/22 | 8:00 PM    | For the trip             |
|       |       |        |            | For us                   |
| CC-1  | Shand | 1/8/22 | 8:01 PM    | For 15                   |
| Shand | CC-1  | 1/8/22 | 8:01 PM    | Yes                      |
|       |       |        |            | What you think           |
|       |       |        |            | ?                        |
| CC-1  | Shand | 1/8/22 | 8:01 PM    | Cheap                    |
| CC-1  | Shand | 1/8/22 | 8:02 PM    | 4 for 4000 n 15 for 8000? |

   Ultimately, CC-1 agreed to participate. On January 11, 2022, she flew from Orlando to Winnipeg. Shortly before 1:00pm, she rented a Nissan Pathfinder at the Winnipeg Airport. After driving about 445 kilometers that day, she returned the car in Winnipeg the next morning around 7:00 am and flew home. 445 km is approximately two round-trip drives from Winnipeg to the border.

   While in Winnipeg, CC-1 sent Shand the weather in Winnipeg and a photo of the snow around her car:

 

Shand later forwarded CC-1 the address outside Chicago in Matteson, Illinois, that Patel sent him.

On January 13, 2022, CC-1 sent Shand a photograph of a handwritten list of money she had received and expenses she had from the trip:



7

Notably, CC-1's debit card statement from Bank of America shows she made multiple purchase in Winnipeg during her trip, including $112.82 at Walmart, $9.66 at McDonalds, and $18.97 at a Shell gas station, which adds up to just under $142, matching the "food (for kids)" category. In addition, on January 13, 2022, a $1500 cash deposit was made into a bank account in the name of CC-1.

e. **January 18-20, 2022**

During the January 18-20, 2022, smuggling event, CC-1 had frequent conversations while Shand was near the Canadian border, including communications with him about waiting on roadside assistance and not having the migrants he was expecting:

| From | To | Date | Time (CST) | Message |
|---|---|---|---|---|
| CC-1 | Shand | 1/19/22 | 7:29 AM | Hey how is it going? |
| Shand | CC-1 | 1/19/22 | 7:34 AM | Still waiting on roadside assistance |
| CC-1 | Shand | 1/19/22 | 7:36 AM | Okay<br>You got anymore ppl? |
| Shand | CC-1 | 1/19/22 | 7:37 AM | No |

After Shand's arrest on January 19, 2022, CC-1 has over 90 communications with Patel on January 19th alone.

## ARGUMENT

### a. The messages between Shand and CC-1 are not hearsay.

The messages between CC-1 and Shand are not hearsay. First, CC-1 routinely sent Shand copies or photographs of necessary travel documents. These messages are not "statements" and so do not implicate the hearsay rule. *See* Fed. R. Evid. 801(a). In addition, many of CC-1's messages simply provide context to Shand's responses. These messages are not hearsay. *See United States v. Lamm*, 5 F.4th 942, 949 (8th Cir. 2021) (finding messages that provide context for defendant's responses are not hearsay). Finally, CC-1 and Shand's messages are not hearsay because CC-1 is a co-conspirator and the statements were made during and in furtherance of the conspiracy.[1] *See* Fed. R. Evid. 801(d)(2)(E).

Rule 801(d)(2)(E) provides that statements by co-conspirators which are in furtherance of the conspiracy are not hearsay. *See United States v. Smith*, 909 F.2d 1164, 1167 (8th Cir. 1990). "It is well-established that an out-of-court declaration of a coconspirator is admissible against a defendant if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration

---

[1] For the same reasons, both Shand and CC-1's statements in the messages between Shand and CC-1 are admissible against Defendant Patel as co-conspirator statements.

was made during the course and in furtherance of the conspiracy." *United States v. Meeks*, 756 F.3d 1115, 1119 (8th Cir. 2014) (*quoting United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir.1978)). A preponderance of the evidence standard applies to this determination. *See Smith*, 909 F.2d at 1167.

Here, a preponderance of the evidence shows that CC-1 was a co-conspirator. She repeatedly participated in the conspiracy, arranging Shand's travel to Minnesota, receiving money from "Harry" [Patel], and traveling to Winnipeg to personally move migrants to the U.S./Canadian border. She knew the purpose of the conspiracy, as shown by her own involvement in Winnipeg and her messages with Shand where he discusses the risks facing the migrants he is picking up.

These statements were in furtherance of the conspiracy. Many of the statements concerned "day to day" issues in the conspiracy, like arranging travel or receiving money. *See United States v. Milsap*, 115 F.4th 861, 872-73 (8th Cir. 2024) (finding statements about the "day to day" operations of the conspiracy like "collecting money" were in furtherance of the conspiracy); *see also See United States v. Armstrong-Davila*, 201 Fed. App'x 551, 552 (9th Cir. 2006) (holding, in human smuggling case, that "statements made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator are in furtherance of a conspiracy") (internal citations omitted).

<mark>10</mark>

And all the statements were well within the timeframe of the conspiracy. *See United States v. Craig*, 94 F.4th 752, 757 (8th Cir. 2024) (rejecting argument that text messages sent weeks before drug sale could not be co-conspirator statements because the text messages fell "squarely within the timeframe of the conspiracy").

Finally, co-conspirator statements are nontestimonial and do not raise issues under the confrontation clause. *See id.* at 757 (8th Cir. 2024).

**b. The Marital Communication Privilege Does Not Apply Here.**

The marital communications privilege can prevent testimony about private communications between spouses. *See United States v. Evans*, 966 F.2d 398, 401 (8th Cir. 1992). Here, though, the marital communications privilege does not apply because Shand and CC-1 were co-conspirators involved in joint criminal activity. *See id.; see also United States v. Picciandra*, 788 F.2d 39, 43 (1st Cir. 1986) ("Communications concerning crimes in which the spouses are jointly participating, however, do not fall within the protection of the marital communication privilege.").

The "partners in crime" exception allows testimony about "communications involving future or ongoing crimes in which the spouses were joint participants *at the time of the communications*." *See Evans*, 966 F.2d at 401. And statements used to induce a spouse to join the conspiracy are similarly outside the privilege. *See United States v. Parker*, 834 F.2d 408, 413

11

(4th Cir. 1987) (finding the "joint participation exception to the confidential marital communication privilege extends to statements made in the course of successfully formulating and commencing joint criminal activity"). It does not matter that only one spouse was prosecuted for the criminal activity. *United States v. Hill*, 967 F.2d 902, 912 (3d Cir. 1992).

Here, Shand and CC-1's statements were about patently illegal activity—smuggling aliens across an international border. *See Evans,* 966 F.2d at 401 (finding husband and wife's communications about "patently illegal" marijuana conspiracy were outside the marital communications privilege). Shand and CC-1, like the co-conspirator spouses in *Evans*, exchanged messages about planning for and participating in the human smuggling conspiracy, as well as receiving payment for their work in the conspiracy. These messages fall well-outside the marital communications privilege.

## **CONCLUSION**

Shand and CC-1 were co-conspirators in the charged alien smuggling conspiracy. Their messages in furtherance of this conspiracy are not hearsay and are not covered under the marital communications privilege. These messages are relevant and admissible at trial.

Dated: October 28, 2024  Respectfully submitted,

ANDREW M. LUGER
United States Attorney

By:  /s/ Ryan Lipes
Ryan Lipes
Trial Attorney
U.S. Department of Justice
N.Y. Bar No. 5404843
(202) 514-4715
Ryan.Lipes@usdoj.gov

Michael P. McBride
Assistant United States Attorney
MN Bar No. 0397292