**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No. 22-40(02) (JRT/LIB)**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

   **v.**

**(1) HARSHKUMAR RAMANLAL**
**PATEL,**
   **a/k/a "Dirty Harry,"**
   **a/k/a Harry Patel,**
   **a/k/a Param Singh,**
   **a/k/a Haresh Rameshlal Patel,**
   **a/k/a Harshkumar Singh Patel,**
**and**

**(2)  STEVE ANTHONY SHAND,**

        **Defendants.**

                                       **GOVERNMENT'S TRIAL**
                                       **BRIEF**

      The United States of America, through its attorneys, Andrew M. Luger,

United States Attorney for the District of Minnesota, Assistant United States

Attorney Michael P. McBride and Trial Attorney Ryan Lipes, respectfully

submits its trial brief in the above captioned case. Included in this

memorandum are a summary of the facts the government expects the evidence

will establish at trial and notice regarding potential evidentiary matters.

## I.    NAME AND CONTACT INFORMATION OF TRIAL COUNSEL

The United States is represented by Assistant United States Attorney Michael P. McBride and Trial Attorney Ryan Lipes.  Their contact information is as follows:

| | |
|---|---|
| Michael P. McBride | Ryan Lipes |
| U.S. Attorney's Office | Department of Justice |
| 300 Fourth Street, Suite 600 | 1301 New York Ave NW |
| Minneapolis, MN 55415 | Washington, DC 20530 |
| Office phone: 612-664-5710 | Office phone: 202-514-4715 |
| Cell phone: 612-508-9732 | Cell phone: 202-794-4312 |
| michael.mcbride@usdoj.gov | ryan.lipes@usdoj.gov |

## II.    THE CHARGES AND LENGTH OF TRIAL

On March 21, 2024, defendants Steve Anthony Shand and Harshkumar Ramanlal Patel were charged by superseding indictment with conspiracy to bring aliens to the United States causing serious bodily injury and placing lives in jeopardy (Count 1) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(B)(iii); aiding and abetting bringing aliens to the United States causing serious bodily injury and placing lives in jeopardy (Count 2) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(iii); bringing or attempting to bring aliens to the United States causing serious bodily injury and placing lives in jeopardy (Count 3) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), and 1324(a)(1)(B)(iii); conspiracy to transport aliens causing serious bodily injury and placing lives in jeopardy (Count 4) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), and

2

1324(a)(1)(B)(iii); aiding and abetting the transport of aliens in the United States causing serious bodily injury and placing lives in jeopardy (Count 5) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(iii); transportation of aliens in the United States causing serious bodily injury and placing lives in jeopardy (Count 6) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), and 1324(a)(1)(B)(iii); and transportation of aliens in the United States for the purpose of commercial advantage and private financial gain (Count 7) in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), and 1324(a)(1)(B)(i). (ECF No. 72.)

The case is set for a jury trial on Monday, November 18, 2024, at the Fergus Falls Federal Courthouse. The United States estimates that the trial, including jury selection, should take approximately five days.

## III. THE ANTICIPATED FACTS AT TRIAL

Between December 12, 2021, and January 19, 2022, the defendants smuggled dozens of individuals across the Canada/United States border. They were part of a large, systematic human smuggling operation that brought Indian nationals to Canada on student visas and then smuggled them across the United States border. Some migrants were smuggled across the border between British Columbia and Washington State. Beginning in December 2021, others were smuggled across the border between Manitoba and Minnesota. The defendants—in coordination with co-conspirators in

Canada—managed the Manitoba to Minnesota crossings.

Defendant Patel coordinated with smugglers in Canada to determine the location, dates, and number of migrants.  He then hired Defendant Shand to pick up the migrants on the United States' side of the border and transport them to Chicago.  The defendants communicated frequently about the risk of smuggling people through the deep cold of the norther border.  But they persisted in their conspiracy nevertheless.  On January 19, 2022, their conspiracy resulted in the deaths of a migrant family of four—two adults and two young children—who all froze to death on the Canadian side of the border.  Defendant Shand was arrested while he waited for the family, and a group of additional aliens.

    a. **Shand and Patel Conspire to Smuggle Aliens into the United States from Canada from December 2021 to January 11-12, 2022.**

Beginning in December 2021, Border Patrol Agents assigned to  the Canada/United States border near Pembina, North Dakota, began noticing a pattern of apparent illegal border crossings.  At the back-country intersection of 180th Street and 410th Avenue North, just east of Pembina in Minnesota, they observed boot prints that crossed the border and appeared to be picked up by a vehicle at the intersection.[1]

---

[1] From Google Maps, accessed on October 15, 2024 at:
https://www.google.com/maps/place/Great+Lakes+Gas+Transmission/@48.9917511,-



Aside from a Great Lakes Gas Transmission pump station, there are no other buildings or facilities at the intersection. In fact, it is so remote and unused that the roads north and west of the intersection are allowed to "plug" with snow in winter. [2]



97.0679919,3138m/data=!3m1!1e3!4m9!1m2!2m1!1spembina!3m5!1s0x52c165503f1f8a29:0xef770d2f32e8a62b!8m2!3d48.9901691!4d-97.0602513!16s%2Fg%2F1tg4l0py?entry=ttu

[2] *Id.*

On Wednesday, December 22, 2021, CBP Agents first saw boot tracks crossing the border and leading directly to the intersection of 180th Street and 410th Avenue North.  On Wednesday, December 29, they observed the same pattern.  On Wednesday, January 12, they found more fresh boot prints leading to the same intersection.  One set of boot prints was consistent across all three events.  Agents also recovered a backpack with a price tag in Indian Rupees at the intersection—a highly unusual item to find in far northern Minnesota.

These smuggling events, and one previous event on December 11-12, 2021, were carried out by the defendants.  Patel and Shand knew each other because they both resided in or around Deltona, Florida, and frequented certain casino game rooms.  Cellphone communications show that they called and messaged each other frequently from December 9, 2021, until January 19, 2022, regarding their conspiracy.  Shand communicated directly with Patel, who in turn communicated with their co-conspirators in Canada to coordinate the drop off of alien migrants on the Canadian side.

In early December 2021, the defendants met and came to an agreement that Shand would fly to Minnesota, use a rental vehicle, and pick up alien migrants near the border to transport them to Chicago, Illinois.  Their text messages lay out the rentals and hotels.  Shortly after they met up in person on December 9, Shand deposited $2,400 into his bank account.

True to the plan, Shand flew to Minnesota and picked up a rental vehicle on December 11, 2021. His cellphone recorded his location as he drove north from Minneapolis to a hotel and then to the border. Early in the morning on December 12, the defendants coordinated the smuggling of a group of migrants via text message. For example,



Shand also messaged his wife and co-conspirator (CC-1). Critically, even on this first trip, Shand and Patel recognized the danger cold weather posed to their migrants. As he was waiting for the smuggled aliens to cross the border, Shand told Patel:



Shand said the same to his wife:



The defendants knew the risk of death or serious bodily injury from the outset. Despite the cold, this group made it. Shand's phone recorded his location as he drove the group to Chicago, before returning to Florida. The next day, Patel dropped off money with CC-1. Shortly thereafter Shand and CC-1 deposited $4,600 into their bank account.

Flight records, car rental agreements, and bank records show the same pattern on December 21-22, and 28-29, 2021. Shand traveled to Minnesota, picked up a rental vehicle, and drove to the border. The defendants' messages show them haggling over payment, arranging flights and rentals, and coordinating the movement of migrants. Each time, they also discussed the dangerous cold. On December 21, 2021, Shand told Patel, "It's cold here 4 degrees," "the high is 12 degrees," "So tonight is going to be cold." On

December 28, Shand told Patel, "It's -9 degrees," "Make sure everyone is worm [sic]". Patel responded, "ya sure boss."

Despite knowing the risks, they nevertheless had the migrants cross. Shand's google translate searches tell the story of the consequence for one migrant. He asked google to translate the following into Hindi on December 29:

| | | | | | |
|---|---|---|---|---|---|
| 12/29/2021 9:07:29 AM\|UT... | she may be hiperthermic | | | GoogleTranslate | वह हिपरथर्मिक हो सकती है |
| 12/29/2021 9:06:46 AM\|UT... | she will get warmer faster | | | GoogleTranslate | वह तेज़ी से गर्म हो जाएगी |
| 12/29/2021 9:06:16 AM\|UT... | she will get warmer faster | | | GoogleTranslate | she will get warmer faster |

Shand was paid handsomely for his part in these crossings. Between December 15 and December 26, he deposited more than $10,000 cash into his bank account.

Before the crossing on January 11-12, 2022, something went wrong on the Canadian side. They needed an extra driver. Text messages between Shand and CC-1 capture their discussion of her joining this crossing. Where previously she had only made reservations for Shand and managed money, she now was set to drive. For $8,000, both Shand and CC-1 agreed. CC-1 bought a ticket to Winnipeg at the last minute and rented a large SUV. She drove 445 kilometers (276 miles) before returning the car less than 24 hours later and flying back to Orlando.

As she drove, CC-1 sent Shand images of the snow outside her car. She

also sent him screen captures of the temperature.





b. **Defendants Smuggle and Transport Aliens on January 19, 2022, Resulting in Four Deaths and Serious Bodily Injury.**

At 6:30 AM on the morning of January 19, 2024, the Humboldt, Minnesota, weather measurement station just south of the border near Pembina recorded a wind chill temperature of -36 degrees Fahrenheit. At that temperature, frostbite to exposed skin can occur within ten minutes and hypothermia is a substantial risk. Both hazards are made substantially more dangerous if an individual is not dressed appropriately in cold-weather gear.

Shand traveled to Minnesota and rented a 15-passenger van on January 17, 2022, after arranging another smuggling operation with Patel. His phone recorded his location as he traveled to Grand Forks, North Dakota, calling

11

Patel along the way. The night of January 18, Shand met with a woman his contacts lists as "Jennie Fargo," with whom he appears to have been romantically involved. She told him "Be careful driving tonight. It is not nice out there," and sent him a screenshot of the then-current blizzard warning:



Shand then forwarded Jennie's screenshot to Patel, saying "make sure everyone is dressed for the blizzard conditions please," before callously calling out his main concern:



Shand also sent videos of the blizzard conditions to Patel as he drove to the intersection.  He had water and food in the car for a large group of people.

As he approached 180th Street and 410th Avenue North around 3:00 AM, Shand's van got stuck.  At that time, 11 Indian nationals, including a family of four with two young children, were searching for Shand's van through the blizzard as they were trying to cross from Canada to Minnesota.  Over the next few hours Patel, panicked, asked Shand to flash his lights so the migrants could see him.  He told Shand to call people in Canada.  The two traded phone calls repeatedly.  Two migrants found Shand while he was stuck. The rest did not.

After being stuck from some time, a technician on his way to work at the pump station saw Shand with two migrants in his van.  The technician got a tractor and pulled Shand from the ditch.  Soon thereafter, U.S. Customs and Border Patrol (CBP) Agent Christopher Oliver arrived.  Agent Oliver

came to the intersection suspecting an illegal crossing may have taken place over night, after the CBP observed boot prints and a backpack at the intersection from the previous crossings. Agent Oliver pulled Shand over and quickly surmised what was occurring. Other law enforcement agents were called to the scene and arrived shortly thereafter.

Given the size of the van, Agents asked Shand whether there were others still walking. Despite knowing additional migrants were in the freezing cold, Shand said no. Five more migrants emerged from the fields. One was so hypothermic that she was slipping in and out of consciousness and had severe frostbite on her nose and fingers. She was rushed to Kittson Memorial Hospital where her internal temperature was below 90 degrees and she was airlifted to Regions Hospital in St. Paul. All of the migrants—who had come from a warm climate in India—were equipped with woefully inadequate cold weather gear.



CBP Agents searched the passports of each of the migrants and found no entry stamps or visas. Further review of their immigration files revealed none of the seven migrants found at the intersection had entered at a port of entry or were lawfully in the United States.

As they booked Shand into jail, an officer asked him again if there were others out in the cold. Again, Shand said no.

One of the migrants walking in the field had a backpack with children's clothing, toys, and diapers inside.



It also contained photos of a family of four. In Canada, the Royal Canadian Mounted Police (RCMP) identified what appeared to be people laying in a field a few yards from the border. They dispatched officers who used a tracked

side-by-side all terrain vehicle to get to the area. There, they found the frozen remains of a father, and his two young children. The father was still holding his infant child wrapped in a blanket. A little way on, officers found his wife's body frozen near a fence. Passports found on the deceased matched the photos of the family in the backpack. Autopsies by Canadian authorities confirmed they had each died due to hypothermia.

## IV. THE GOVERNMENT'S EVIDENCE

The United States will provide the jury the facts necessary to establish the elements of the alleged offenses, while also ensuring that its presentment provides the jury with sufficient context to make an informed determination regarding the facts. To that end, the government will present a largely chronological case showing the defendant's conspiracy from its inception in December 2021.

At trial, the government plans to call four broad categories of witnesses. First, law enforcement officers who responded to the scene of the January 19, 2022, smuggling event and collected evidence in both the United States and Canada. Second, law enforcement agents who investigated the defendants' scheme and developed evidence after January 19. Third, expert witnesses who will provide information and opinions regarding the weather, location data from the defendants' phone records, fingerprints, and the cause of death of each deceased migrant. Fourth, the government will call a limited number

16

of lay witnesses who interacted with Shand on January 19, or treated two of migrants who survived, but suffered injuries.

In addition, the government may call two additional groups. First, a cooperating witness who was part of the human smuggling conspiracy and sent many of the January 19 migrants to Winnipeg to cross into Minnesota after he was unable to cross them from British Columbia into Washington State. Second, the government may call one or more of the migrants who crossed from Canada to the United States on January 19, 2022.

## V.    POTENTIAL LEGAL AND EVIDENTIARY ISSUES

The government provides the following analysis concerning possible legal and evidentiary issues at trial.

### a. Summary Witness and Summary Exhibits

Pursuant to Fed. R. Evid. 1006, the government intends to use summaries of certain voluminous records. These include: 1) a summary of flights taken by Defendant Shand, CC-1, and Canadian coconspirator 2 (CC-2); 2) a summary of rental car records of Defendant Shand, and conspirators CC-1, and CC-2; 3) a summary of bank deposits by Defendant Shand and CC-1, 4) a summary calendar depicting the conspirator's actions in December 2021 and January 2022; 5) maps depicting cellphone location data for the defendants during the course of the conspiracy; and 5) narrowed selections of text messages and phone logs from the defendants' phones. These exhibits

will be explained by Special Agent Jimmy Jimenez, HSI Analyst Devin Stefonowicz, and Special Agent Nicole Lopez during their testimony. Drafts of the summary exhibits will be provided to the defendants in advance of trial. Special Agent Jimenez will serve as a summary witness to the many investigative steps taken by law enforcement and will place the evidence gathered into a complete picture.

Summary evidence is properly admitted when (1) the charts "fairly summarize" voluminous trial evidence; (2) they assist the jury in "understanding the testimony already introduced"; and (3) "the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary." *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980). All three of these criteria are met in this case, and the use of summary charts in the manner proposed by the Government is proper. "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." *Id*.

### b. Co-Conspirator Statements

The government will introduce statements made by the defendants' co-conspirators including CC-1 and CC-2, and potentially a cooperating witness. Rule 801(d)(2)(E) of the federal rules of evidence provides that statements by coconspirators which are in furtherance of the conspiracy are not hearsay. *See*

*United States v. Smith*, 909 F.2d 1164, 1167 (8th Cir. 1990). "It is well-established that an out-of-court declaration of a coconspirator is admissible against a defendant if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Meeks*, 756 F.3d 1115, 1119 (8th Cir. 2014) (*quoting United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir.1978).

The phrase "in furtherance of the conspiracy" is to be interpreted broadly. *Meeks*, 756 F.3d at 1119 ("we interpret the phrase in furtherance of the conspiracy broadly." (*quoting United States v. Cazares*, 521 F.3d 991, 999 (8th Cir. 2008)) *See also United States v. Davis*, 457 F.3d 817, 825 (8th Cir. 2006)). "Statements made 'in furtherance' of a conspiracy include those which identify the coconspirators or the coconspirators' supply source for the illegal drugs and those statements which discuss a coconspirator's role in the conspiracy." *Meeks*, 756 F.3d at 1119 (*quoting United States v. Arias*, 252 F.3d 973, 977 (8th Cir. 2001) (internal citation omitted)). Statements in alien smuggling cases to keep a co-conspirator abreast of one's activities are also "in furtherance of the conspiracy." *See United States v. Armstrong-Davila*, 201 Fed. App'x 551, 552 (9th Cir. 2006) (holding "statements made to keep a conspirator abreast of a co-conspirator's activities, or to induce continued

participation in a conspiracy, or to allay the fears of a co-conspirator are in furtherance of a conspiracy") (internal citations omitted).

The declarant's part in the conspiracy must be demonstrated by a preponderance of the evidence, and the statement itself may include the proof necessary to make such a showing. *Smith*, 909 F.2d at 1167. Furthermore, if that preponderance showing is met, the "'Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of [Fed.Evid.] Rule 801(d)(2)(E).'" *United States v. Valverde*, 846 F.2d 513, 516 (8th Cir. 1988)(*quoting Bourjaily v. United States*, 107 S.Ct. 2775, 2782 (1987)).

### c. Certified Business and Other Records

The United States will introduce into evidence a variety of certified business and public records under Fed. R. Evid. 803(6), 803(8), 902(4), and 902(11). "[T]estimonial statements of a witness who did not appear at trial" are inadmissible under the Confrontation Clause of the Sixth Amendment. *Crawford v. Washington*, 541 U.S. 36, 36 (2004). Evidence is testimonial, and therefore inadmissible without a witness, if it has "a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution." *United States v. Noria*, 945 F.3d 847, 851 (5th Cir. 2019) (*quoting Bullcoming v. New Mexico*, 564 U.S. 647, 659 (2011)). As such, "public records are generally not testimonial because they are 'created for the

administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial.'" *Id.* (*quoting Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)).  Following similar logic, under Federal Rule of Evidence 803(8) public records are exempt from the rule against hearsay and are therefore admissible without a witness.  *Id.* at 852.

In this case, the government will introduce flight, car rental, cellphone provider, medical, and bank records obtained pursuant to subpoenas and warrants.  Copies of these records and their respective certificates have been provided to the defense pursuant to the rules and are non-testimonial.

The government will also introduce certified copies of government immigration records pertaining to Defendant Patel, and the migrants from the January 19, 2022, smuggling event.  In particular, the government will introduce copies of the alien migrants' I-213 forms.  The Department of Homeland Security (DHS) prepares a form I-213, Record of Deportable/Inadmissible Alien, before initiating removal proceedings.  The information contained in the I-213 is collected during an interview of the alien by a DHS officer and includes biographical information such as the alien's country of birth along with the date, place, time, and manner of entry into the United States.

In the context of Form I-213, the government was unable to find any controlling case law withing the Eighth Circuit.  The Fifth Circuit, however,

has recognized that the biographical information contained within the forms is a non-testimonial public record not subject to Confrontation Clause limitations or hearsay rules. *Id. See Flores-Valle v. Garland*, No. 20-61130, 2023 WL 5133483 (5th Cir. Aug. 10, 2023) (holding Form I-213 admissible without witness in immigration proceedings); *See also United States v. Guia-Lopez*, No. 22-50234, 2023 WL 5236764 (5th Cir. Aug. 15, 2023) (holding biographical information about aliens contained within administrative records as admissible without a witness in a conspiracy to transport illegal aliens and transportation of illegal aliens for financial gain case); *United States v. Rodriguez*, No. 21-51154, 2022 WL 3716475 (5th Cir. Aug. 29, 2022) (holding that biographical information obtained during the immigration processing of aliens was nontestimonial in a conspiracy to transport illegal aliens and transportation of illegal aliens for financial gains case).

In *Noria*, the court reasoned that because "Form I-213s are routinely produce by DHS and are not generated solely for use at trial," therefore the biographical information they present is "nontestimonial". *Id.* at 857-58. Further, the court held that "I-231s were admissible under Rule 803(8)'s public-records exception to the rule against hearsay" because "they are 'routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparing for a criminal prosecution.'" *Id.* at 859-60. (*quoting United States v. Caraballo*, 595 F.3d

1214, 1226 (11th Cir. 2010)). As a result, the biographical information contained in Form I-213s "offend[s] neither the Confrontation Clause nor the Federal Rules of Evidence." *Id.* This Court should follow the Fifth Circuit's reasoning and permit the introduction of the I-213 as a non-testimonial public record.

Finally, the United States will introduce data generated from the extractions of cellphones belonging to the defendants. This data is certified and self-authenticating pursuant to Fed. R. Evid. 902(11), 902(13), and 902(14). Copies of the certificates and underlying data have previously been provided to the defendants in discovery.

### d. Expert Testimony

The United States will introduce expert testimony by five expert witnesses. First, the government will call Special Agent Nicole Lopez, an FBI Cellular Analysis Survey Team expert, who will present evidence regarding cellphone location and call data. Second, the government will call Daryl Ritchison, the North Dakota State Climatologist Director, who will testify regarding weather conditions on January 19, 2022, and the danger of cold weather to human beings. Third, the government will call Dr. Angela Miller, a Canadian Forensic Pathologist, who will testify regarding the autopsies she conducted of two deceased migrant children. Fourth, Dr. Charles Littman, a Canadian Forensic Pathologist, who will testify regarding the autopsies he

conducted of two deceased adult migrants. Fifth, the government will call Craig Hellmann, a fingerprint specialist, who confirmed that Defendant Patel is the same individual who submitted fingerprints for certain immigration records in 2020.

### e. Expected Foreign Discovery

The United States has been working through the official Mutual Legal Assistance Treaty process with the government of Canada to obtain certain items of discovery for four months. The expected disclosures include 1) autopsy reports for the deceased migrants, and 2) Royal Canadian Mounted Police reports regarding the discovery of the deceased migrants in Canada. Despite consistent engagement and emphasis, this evidence has not yet been provided to the United States by Canadian authorities, but the government expects to receive it before trial. The government has been in routine dialogue with defense counsel regarding these circumstances. The government has provided updates to the defendants by phone, email, and through its disclosures, concerning this evidence and its expected content to prevent surprise on the eve of trial. As soon as Canada provides this evidence to the United States, the government will disclose it to the defendants.

### f. Sensitive Photographs

Included in the expected disclosures from Canada are photographs of the deceased. These will likely include both autopsy photographs and

photographs of their remains as they were found in a field in Canada. Two of the deceased were young children. In order to prove its case and conclusively link these deaths to the defendants, the government intends to introduce a limited number of photographs. Although they may be upsetting to some, they are relevant and necessary to prove the government's case. When it is necessary to publish these photographs, the government requests that they be published to the parties, Court, and Jury only.

## VI.    THE GOVERNMENT'S MOTIONS *IN LIMINE*

The United States has filed the following motions *in limine* by separate filing:

1. Motion to permit *res gestae* evidence under Fed. R. Evid. 404(b)

2. Motion to permit admission of coconspirator statements by CC-1 piercing the spousal communication privilege

## VII.   STIPULATIONS

The United States will work with the defendants to arrive at certain stipulations to streamline its presentment at trial. These include:

1. Stipulations concerning the authenticity and admissibility of evidence seized by Homeland Security Investigations Special Agent Daniel Schutz during the arrest of Defendant Patel.

2. A stipulation regarding the cause and manner of death of two adult alien migrants.

3. A stipulation regarding the fingerprint analysis conducted by Senior Fingerprint Specialist Craig Hellmann.

Dated: October 28, 2024                    Respectfully submitted,

                                           ANDREW M. LUGER
                                           United States Attorney

                                           *s/Michael P. McBride*

                                           BY: MICHAEL P. MCBRIDE
                                           Assistant United States Attorney
                                           MN Bar No. 0397292

                                           BY:  RYAN LIPES
                                           Trial Attorney
                                           NY Bar No. 5404843