UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-40 (JRT/LIB)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **GOVERNMENT'S** |
| v. ) | **POSITION REGARDING** |
| ) | **SENTENCING** |
| (2) STEVE ANTHONY SHAND ) | |
| ) | |
| Defendant. ) | |

The United States of America, through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Assistant United States Attorney Michael P. McBride, respectfully submits its position with respect to the sentencing factors in this case relating to defendant Steve Anthony Shand.

A jury convicted Mr. Shand for his role in smuggling migrants from India into the United States via Canada in December 2021 and January 2022. The evidence at trial showed that Mr. Shand conspired with his co-defendant, Harshkumar Ramanlal Patel, to smuggle migrants illegally into the United States through brutal winter conditions at least five times. Despite experiencing first-hand the dangerous weather and knowing the harm it caused migrants, Mr. Shand did not stop. Instead, he rented larger and larger vehicles to smuggle more and more migrants in pursuit of larger paydays.

1

On January 19, 2022, this disregard for the safety of others led to the foreseeable and preventable deaths of a 3-year-old boy, an 11-year-old girl, and their parents, who froze to death in an isolated area near the U.S./Canada border. Even as this family wandered through the blizzard at 1:00 AM, searching for Mr. Shand's van, Mr. Shand was focused on one thing, which he texted Mr. Patel: "we not losing any money." Worse, when Customs and Border Patrol arrested Mr. Shand sitting in a mostly unoccupied 15-passenger van, he denied others were out in the snow—leaving them to freeze without aid.

Based on the sentencing guidelines and the factors in 18 U.S.C. § 3553, the Government thus requests that the Court impose a sentence of 130 months.

## **FACTUAL AND PROCEDURAL BACKGROUND**
**A. Offense Conduct**

The United States agrees with the facts from the "Offense Conduct" section of the Pre-Sentencing Report (the "PSR"). (*See* ECF 213; PSR ¶ 8-24). The facts, outlined below, were proven at trial in this matter.

Between December 12, 2021, and January 19, 2022, Defendant Shand conspired with co-defendant Patel and others to smuggle dozens of individuals across the Canada/United States border. They were part of a large, systematic human smuggling operation that brought Indian nationals to Canada on student visas and then smuggled them across the United States border.

Mr. Patel coordinated with smugglers in Canada to determine the

2

location, dates, and number of migrants. (PSR ¶ 10). He hired Mr. Shand to pick up the migrants on the U.S. side and transport them to Chicago. *Id.*

Cell site location information, text messages, flight records, car rental agreements, and bank records show the defendants coordinated five smuggling trips in in December 2021 and January 2022. Those trips occurred on or about December 12-14, 2021; December 21-22, 2021; December 28-29, 2021; January 11-13, 2022; and January 18-19, 2022. (PSR ¶¶ 11-19). Mr. Patel paid Mr. Shand thousands of dollars for each of these trips. (*See* PSR ¶¶ 10, 12-15).

The defendants communicated often about the risk of smuggling people through the deep cold of the northern border. Even on the first trip, Mr. Shand and Mr. Patel recognized the danger cold weather posed to their migrants. Mr. Shand—sitting in the cold—messaged Mr. Patel that it was "16 degrees cold as hell" and asked if "they going to be alive when they get here?" (PSR ¶ 12). Mr. Shand and Mr. Patel discussed the same dangers on the next two December trips. On December 21, 2021, Mr. Shand told Mr. Patel, "It's cold here 4 degrees," noting that "the high is 12 degrees" and "so tonight is going to be cold." (PSR ¶ 14). On December 28, Mr. Shand told Mr. Patel, "It's -9 degrees," and that Mr. Patel needed to "make sure everyone is worm [sic]". *Id.* Mr. Patel responded, "ya sure boss." *Id.* Mr. Shand's Google translate searches tell the story of the consequence for one migrant. He asked Google to

3

translate the following into Hindi on December 29: "She may be hiperthermic [sic]." Gov't Ex. 46 at 119. But they nevertheless persisted in their conspiracy.

For the smuggling trip on January 11-12, 2022, the defendants also recruited Mr. Shand's wife to go to Winnipeg and assist in moving migrants to the border. (PSR ¶ 15). These migrants included kids, as documented in Mr. Shand's wife's log from the trip. *See* Gov't Ex. 46 at 177.

For the last smuggling trip, Mr. Shand traveled to Minnesota and rented a 15-passenger van on January 17, 2022. (PSR ¶ 16). The next day, Mr. Shand's phone recorded his location as he traveled to Grand Forks, North Dakota, calling Mr. Patel along the way. *See* Gov't Ex. 87 at 26.

On the evening of January 18, 2022, Mr. Shand sent Mr. Patel a screenshot with a Weather Channel blizzard alert, warning of wind gusts as high as 50 mph and wind chill temperatures below -45 degrees. (PSR ¶ 16). Mr. Shand also asked Mr. Patel to "make sure everyone is dressed for the blizzard conditions please," before callously calling out his main concern: "we not losing any money." Gov't Ex. 46 at 189-190.

The weather that night and the next morning was extreme. The Humboldt, Minnesota weather station recorded the wind child temperature at 6:30 AM the next morning of -36 degrees Fahrenheit. *See* Gov't Ex. 1B. As Climatologist Daryl Ritchison explained at trial, frostbite to exposed skin can occur within ten minutes at that temperature and hypothermia is a

4

substantial risk. Both hazards are made substantially more dangerous if an individual is not dressed appropriately in cold-weather gear.

Mr. Patel and Mr. Shand tried to cross eleven migrants that night in these extreme conditions. (PSR ¶ 16). As Mr. Shand approached his pick-up area around 3:00 AM, his van got stuck. (PSR ¶ 17). At that time, 11 Indian nationals, including a family of four with two young children, were searching for Mr. Shand's van through the blizzard as they were trying to cross from Canada to Minnesota. *Id.* Over the next few hours Mr. Patel, panicked, asked Mr. Shand to flash his lights so the migrants could see him. *Id.* The two traded phone calls repeatedly. *Id.* He told Mr. Shand to call people in Canada. *See* Gov't Ex. 46 at 205-214. Two migrants found Mr. Shand while he was stuck. (PSR ¶ 17). The rest did not.

Eventually, Border Parol Agent Christopher Oliver saw Mr. Shand's van, stopped him, and arrested him with two migrants illegally in the United States inside. (PSR ¶ 18). Given the size of the van, Agents asked Shand whether there were others still walking. Mr. Shand said "no." *Id.*

Five more migrants emerged from the fields. *Id.* None of the migrants were lawfully in the United States. (PSR ¶ 19). One was so hypothermic that she was slipping in and out of consciousness and had severe frostbite on her nose and fingers. (PSR ¶ 18). She was rushed to Kittson Memorial Hospital where her internal temperature was below 90 degrees and then airlifted to

5

Regions Hospital in St. Paul. *Id.* All the migrants were equipped with woefully inadequate cold weather gear. *Id.* As one of the migrants, Yash Patel, testified at trial, they were all from Gujarat, India, where they had no exposure to cold climates. Mr. Patel testified he had never seen snow before and wore the winter clothes that the smugglers provided.

That afternoon in Canada, the Royal Canadian Mounted Police (RCMP) found the four other migrants in a field a few yards from the border. (PSR ¶ 20). In one place, they found the frozen remains of a father and his two young children. He was still holding his infant child wrapped in a blanket. *Id.* A little way on, officers found his wife's body frozen near a fence. *Id.* Autopsies by Canadian authorities confirmed all had died of hypothermia. *Id.*

That same day, Mr. Patel went to a phone store and changed his phone number, hoping to avoid detection. *See* Gov't Ex. 89.

**B. Procedural History**

Defendant Shand was arrested at the border by United States Customs and Border Patrol on January 19, 2022. He has been on pretrial release with conditions since he was charged in this case.

He was initially charged by complaint and then indicted on February 16, 2022. As relevant here, a grand jury returned a second superseding indictment against Mr. Shand on November 6, 2024. Defendant Shand, along with his co-defendant Patel, pleaded not guilty and demanded a jury trial.

6

Trial began in Fergus Falls, Minnesota, on November 18, 2024. On November 22, a jury convicted Shand and Patel on all four counts of the second superseding indictment: Conspiracy to Bring Aliens to the United States Causing Serious Bodily Injury and Placing Lives in Jeopardy; Conspiracy to Transport Aliens Causing Serious Bodily Injury and Placing Lives in Jeopardy; Attempted Transportation of Aliens for the Purpose of Commercial Advantage and Private Financial Gain; and Aiding and Abetting the Attempted Transportation of Aliens for the Purpose of Commercial Advantage and Private Financial Gain.

**C. The Pre-Sentence Report**

On January 31, 2025, the United States Probation Office issued a preliminary PSR. (ECF 191). Both the government (ECF 204) and the defendant (ECF 207) filed objections. The U.S. Probation Office issued its final revised PSR on March 18, 2025. (ECF 209).

The PSR applied a base offense level of 12 under U.S.S.G. §2L1.1. The PSR applied 3-point enhancement for smuggling 6-24 individuals under U.S.S.G. §L21.1(b)(2)(A). The PSR also applied a 3-point enhancement under U.S.S.G. §2L1.1(b)(6) because the offense intentionally or recklessly created a substantial risk of death or serious bodily injury to another person, and a 10-point enhancement under U.S.S.G. §2L1.1.(b)(7) because death resulted.

The PSR calculated a total offense level of 28. (PSR ¶ 41). It also determined that Mr. Shand falls into criminal history category I. (PSR ¶ 46). At this offense level, the guidelines range is 78-97 months imprisonment. (PSR ¶ 76).

The PSR also identified factors that may warrant an upward departure under U.S.S.G. §5K2.0(a)(2)(A) and §5K2.0(a)(3). (PSR ¶¶ 95-96)

**D. Defendant Shand's Objections**

Mr. Shand objected to any enhancement under U.S.S.G. §2L1.1(b)(7)(D), arguing that Mr. Shand's conduct was not the causal conduct creating the dangerous conditions resulting in injuries and death.

**E. The Government's Objections**

The Government made two unresolved objections. First, the Government argued that the evidence at trial showed by a preponderance that Mr. Shand's conspiracy involved him smuggling 25 or more aliens into the United States, warranting a 6-point adjustment under U.S.S.G. §2L1.1(b)(2), rather than the 3-point adjustment for smuggling 6-24 aliens.

Second, the Government argued that the vulnerable victim enhancement should apply here because two of the deceased victims were minors and all the migrants were particularly vulnerable due to their lack of familiarity with extreme cold weather and their reliance on the smugglers for warm clothing.

The vulnerable victim enhancement would warrant a 2-point adjustment under U.S.S.G. §3A1.1(b)(1).

The Government otherwise agrees with the PSR. Thus, if the Court applies U.S.S.G. §2L1.1(b)(2) and §3A1.1(b)(1) as the Government argues, Mr. Shand's total offense level would be 32. At a criminal history category I, the guidelines range would be 121-151 months imprisonment.

## ARGUMENT

I. **The U.S. Sentencing Guidelines**

   a. **A 6-Point Adjustment under U.S.S.G. §2L1.1 Applies Because the Offense Involved Smuggling or Transporting 25 or More Aliens**

The PSR argues that there is only sufficient evidence to show that the defendant smuggled 11 aliens. (PSR ¶ 30). It says that "investigative material suggests" additional aliens, but it concludes that because they were not intercepted by law enforcement and their names are not known, they should not be counted. *Id.*

But the evidence presented at trial proved by a preponderance of the evidence that more than 25 aliens were smuggled. The evidence showed that the defendant engaged in five separate smuggling trips with his co-defendant Mr. Patel. The first trip on December 11, 2021, required Mr. Shand to make two trips in a 4-passenger vehicle, showing a minimum of 5 smuggled aliens on that trip and up to 10. The second trip, on December 21, 2021, involved one

carload of aliens in a 5-passenger vehicle, indicating up to 5 smuggled aliens. The third trip, on December 30, 2021, was preceded by text messages between the defendants showing a plan to pick up 7-8 individuals and a rental vehicle with larger passenger capacity. The fourth trip, on January 11, 2022, consisted of 15 aliens. Two pieces of evidence prove this fact: text messages specifically discussed this number, and Mr. Shand rented a large 15-passenger van for the trip.

This shows at least 40 aliens were smuggled by the defendant as part of this conspiracy. Indeed, if only the final two smuggling events (January 10-13 and January 19, 2022) are counted, then the defendant still exceeds the 25 aliens necessary to justify the 6-level adjustment. So under USSG §2L1.1(b)(2), the defendant should receive an increase of 6-levels, instead of 3-levels.

### b. The 2-Point Vulnerable Victim Adjustment Applies under U.S.S.G. §3A1.1(b)(1)

Consistent with caselaw across the country, the vulnerable victim adjustment under U.S.S.G. §3A1.1(b)(1) should apply here for two reasons. First, two of the victims were minors—one was 3 and was one 11—and would have been unusually vulnerable to the weather conditions and how this smuggling enterprise operated. Second, all the migrants on January 19, 2022, were from Gujarat, India, were unfamiliar with extreme winter weather

10

conditions, and they relied on their smugglers to provide weather-appropriate clothing, which the smugglers failed to do here.

### i.    The Vulnerable Victim Enhancement Can Apply in Alien Smuggling Cases

Aliens are not categorically excluded as "victims" for purposes of the vulnerable victim enhancement if the government can show a particular vulnerability in addition to status as an illegal alien.[1] *See United States v. De Oliveira*, 623 F.3d 593, 598-99 (8th Cir. 2010) (finding error in applying vulnerable victim enhancement in harboring illegal aliens case based solely on status as illegal aliens "without a sufficient factual analysis as to why the undocumented workers in this case were unusually vulnerable").

The Eighth Circuit's analysis in *De Oliveira* is consistent with how other circuits have applied the vulnerable victim enhancement in cases involving Section 1324 offenses. To the government's knowledge, no circuit has

---

[1] In addition to case law specific to alien smuggling, courts have upheld the use of the vulnerable victim enhancement in similar circumstances where the victim participates in the offense in some way, such as in drug distribution cases. For example, in cases involving drug overdoses resulting in death, courts have applied the adjustment for particularly vulnerable victims even though the victims sought to purchase illegal drugs. *See United States v. Volkman*, 797 F.3d 377, 398-99 (6th Cir. 2015) (finding vulnerable victim enhancement applied in drug overdose resulting in death case when victim was particularly vulnerable due to mental and emotional frailties); *United States v. Reeves*, 797 F. App'x 759, 760 (4th Cir. 2020) (rejecting argument that there is no victim of a drug crime and applying vulnerable victim enhancement).

11

categorically prohibited application of the vulnerable victim adjustment in alien smuggling cases. On the contrary, multiple circuits have upheld its application when the government shows a particular vulnerability in addition to the victim's status an illegal alien. *See, e.g., United States v. Dock*, 426 F.3d 269, 273 (5th Cir. 2005) (applying vulnerable victim enhancement in alien transportation case when aliens kept in cramped conditions for two weeks and transported in locked truck for twelve hours). The smuggling of children in dangerous conditions, who do "not fully appreciate the danger involved in illegal smuggling," is a particularly appropriate application of §3A1.1(b)(1). *See United States v. Miguel*, 368 F.3d 1150, 1157 (9th Cir. 2004), overruled on other grounds *by United States v. Gasca-Ruiz*, 852 F.3d 1167 (9th Cir. 2017).[2]

### ii. The Vulnerable Victim Enhancement Should Apply Here

The vulnerable victim enhancement should apply here for two reasons. First, the offense involved two young children (3 and 11 years old). Neither could "fully appreciate the danger" here of the severe winter weather. *See Miguel* at 1157. And, as climatologist Daryl Ritchison and the forensic

---

[2] *Gasca-Ruiz* adopted an abuse of discretion, rather than a clear error, standard for appellate review of guideline-application decisions in the 9th Circuit. 852 F.3d at 1173-74. As stated explicitly in *Gasca-Ruiz*, however, *Miguel* "would not come out any differently." *Id.* at 1174.

pathologists testified, their young age made them particularly vulnerable to these extreme winter conditions.

Second, the migrants were from Gujarat, India, and so had a particular vulnerability to the extreme winter weather conditions because they had no experience with cold weather or snow and they relied on their smugglers for appropriate clothing. As Yash Patel testified at trial, he had never seen snow before arriving in Canada. The migrants' clothing for the conditions was limited to what the smugglers provided them. Indeed, Mr. Shand messaged Mr. Patel to "make sure everyone is dressed for the blizzard conditions," which recognizes that the migrants' winter clothing would be the smugglers' responsibility. Mr. Shand's previous trips had involved Indian nationals, at least one of whom suffered from hypothermia, showing Mr. Shand's knowledge of the vulnerability. Yash Patel's testimony confirmed this, indicating that the winter clothing was provided by the smugglers. Yet this Court heard repeatedly at trial that the migrants were provided inappropriate clothing for the conditions, including boots (introduced in evidence at trial) not designed for extreme winter weather conditions like the migrants experienced on January 19, 2022.

To be clear, as *De Oliveira* and other cases hold, the fact that they were illegal aliens cannot be considered as an unusual vulnerability. Here, though, an unusual vulnerability exists because the migrants had so little

13

understanding of the extreme winter weather conditions, the smugglers controlled when the migrants crossed, and the smugglers controlled what clothing the migrants had

Additionally, Mr. Shand knew or should have known of these vulnerabilities. As shown in text messages, Mr. Shand knew of the extreme weather and, given the multiple previous smuggling trips, knew that they were smuggling Indian migrants unfamiliar with the winter weather of Canada and northern Minnesota. Indeed, on a previous trip on December 29, 2021, Mr. Shand had translated into Hindi on his phone, "she may be hyperthermic [sic]." And Mr. Patel was born and lived in Gujarat, so he had personal knowledge that these migrants would have little experience with extreme winter weather. Moreover, the defendants knew they were smuggling children. In the previous smuggling trip one week prior, for example, Mr. Shand's wife had itemized "food (for kids)" in a log of expenses from her portion of the work in Canada. Mr. Shand knew who he was smuggling.

For these reasons, the Court should apply the 2-level enhancement under U.S.S.G. §3A1.1(b)(1).

### c. The PSR Correctly Applied the 10-point Enhancement for the Death of Four People under U.S.S.G. §2L1.1(b)(7)(D)

Despite Mr. Shand's objection, the PSR correctly applied the 10-point enhancement for the offense resulting in death. (PSR ¶ 33). Mr. Shand argues

his conduct was not causally linked to the conduct that created the dangerous conditions resulting in death. On the contrary. The evidence at trial showed by a preponderance that Mr. Shand's actions were directly linked to the dangerous condition. As discussed above, from the very first smuggling trip, Mr. Shand recognized the danger the winter weather conditions posed the aliens he was smuggling. Not only that, but he knew the particular danger—hypothermia—had afflicted at least one alien before January 19, and he knew children were among those that would be smuggled. By agreeing nevertheless to pickup and transport these aliens, he created the circumstance that led to their deaths. Moreover, Mr. Shand never took any action to help the people he knew were wandering in the cold. For hours, he simply sat in his stuck van. He never called 911. He never called border patrol. He did not seek help. Worse, when asked whether other aliens were out in the cold, he said "no." By knowingly leaving aliens in conditions he knew were deadly, he directly contributed to the deaths of the Patel family.

### d. An Upward Departure May Be Warranted

The Government agrees with probation that factors in this case warrant consideration of an upward departure under U.S.S.G. §5K2.0(a)(2)(A) and §5K2.0(a)(3). (*See* PSR ¶¶ 94-97).

In particular, if the Court does not find the vulnerable victim adjustment applies, a departure is warranted to account for the fact that a 3-year-old boy

15

and an 11-year-old girl—who had no control over this situation—died because they were placed into these hazardous conditions by Mr. Shand and his co-conspirators. Furthermore, the sentencing guidelines do not adequately account for the deaths of four people here, as the guidelines apply the same 10-point enhancement for one death as it does for four. *See* U.S.S.G. §5K2.1 (Death Policy Statement) (noting that an appropriate factor is "whether multiple deaths resulted" and that a "substantial increase may be appropriate if the death was intended or *knowingly risked*").

## II.   The Appropriate Sentence under the § 3553(a) Factors

Based on the sentencing factors in 18 U.S.C. § 3553, a significant sentence is warranted here. As explained below, the nature and circumstances of the offense show the defendant's knowing disregard for the lives and safety of migrants for financial profit. A sentence of 130-months imprisonment adequately accounts for the need for the sentence imposed to reflect its seriousness, promote respect for the rule of law, provide a just punishment, deter this type of criminal conduct, and protect the public from the dangers of human smuggling. *See* 18 U.S.C. § 3553(a)(2).

Five times Mr. Shand sat in the frigid winter conditions, experiencing first-hand how dangerous—and deadly—the cold could be. Yet he kept going back. He kept going back because he wanted more money. He did not recognize the humanity of the migrants he was endangering; he saw only a payday. And

his disregard for their humanity resulted in the avoidable deaths of two young children and their parents.

From the jump, Mr. Shand knew the cold would kill. On the very first smuggling trip in December 2021, Mr. Shand warned Mr. Patel that it was "16 degrees cold as hell" and asked if "they going to be alive when they get here?" On the next trip, Mr. Shand informed Mr. Patel that it was "cold here 4 degrees" with a high of 12 degrees, emphasizing "so tonight is going to be cold." On the third trip in December 2021, Mr. Shand emphasized that "it's -9 degrees" and to "make sure everyone is worm [sic]." Later that night, Mr. Shand would ask Google Translate how to say she may be hypothermic in Hindi. On the night before the deaths, Mr. Shand sent Mr. Patel the blizzard warning, warning of wind gusts as high as 50 mph and wind chills that could reach temperatures below -45 degrees.

Despite these warnings, Mr. Shand never said "stop." He kept returning to the border. He discussed the people he was smuggling like they were objects—"boxes" to be shipped in the cold at night no matter the danger.

Mr. Shand's callousness reached its apex as he sat in the warmth of his 15-passenger van while 11 migrants wandered through a blizzard for hours. He did not call for help. And when help arrived despite his inaction, he did nothing. Mr. Larsen—who pulled Mr. Shand from the ditch—testified that if he had known people were out in that cold, he would have done everything he

could to find them. The Border Patrol agents said the same. But they did not have that chance because Mr. Shand did not tell them others were out there. He denied there were others altogether.

Because of their actions, a young woman had to be life-flighted to a hospital burn unit with an internal body temperature below 90 degrees. Because of their actions, a father froze to death shielding his 3-year-old boy's face from the blistering wind; huddled with his 11-year-old girl in ill-fitting boots and gloves; and just a few hundred meters from their mother, who died slumped against a chain-link fence she must have thought salvation lay behind. All the while Mr. Shand worried about his payday, "we not losing any money."

## **CONCLUSION**

A significant sentence is needed here to reflect the seriousness of the conduct, promote the respect for the rule of law, provide punishment for the offense, deter this type of criminal conduct, and protect the public from further crimes from Mr. Shand. The Government submits that a sentence of 130-months—middle of the guidelines under the Government's calculation—would adequately serve the needs of sentencing here.

Dated: May 14, 2025                    Respectfully submitted,

                                       LISA D. KIRKPATRICK
                                       Acting United States Attorney

18

By: <u>*/s/ Michael P. McBride*</u>
Michael P. McBride
Assistant United States Attorney
MN Bar No. 0397292